Bruce M. and Dorothy V. CADY et al., Appellants,

v.

Rogers C. B. MORTON, Secretary of the Department of Interior, et al., Appellees.

No. 74–1984.

United States Court of Appeals, Ninth Circuit.

June 19, 1975.

Bruce J. Terris (argued), Washington, D. C., for appellants.

Otis Packwood, U. S. Atty. (argued), Billings, Mont., George J. Miller (argued), Philadelphia, Pa., Daniel H. Israel (argued), Boulder, Colo., for appellees.

## OPINION

Before VAN OOSTERHOUT,* BROWNING and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This is an appeal from an action which sought a declaratory judgment that certain coal leases entered into between Westmoreland Resources and the Crow Tribe of Indians and approved by the Bureau of Indian Affairs (BIA) of the Department of the Interior were invalid and which further sought to enjoin strip mining operations thereunder. Plaintiffs (appellants herein) were individuals living on the "Crow Ceded Area" in Montana and Friends of the Earth. Defendants were the Crow Tribe of Indians, Westmoreland Resources, Secretary of the Interior, the Commissioner of the BIA, the Superintendent of the Crow Agency of the BIA, the Director of the United States Geological Survey (USGS), and the Area Mining Supervisor of the Conservation Division of the USGS.

The land involved in the present controversy is within the Crow Ceded Area, which was originally part of the Crow reservation but which was ceded back to the United States under a 1904 agreement. The lands were opened to homesteaders in 1909, but only surface interests could be acquired by homestead. Certain of the original individual plaintiff-appellants are successors in interest to persons who obtained title through homestead to portions of the Crow Ceded Area.

In 1970, as part of a program to develop coal reserves in the Crow Ceded Area, the Crow Tribe granted two prospecting permits, including options to lease, to Westmoreland. The latter exercised the options in June, 1972 and by means of two agreements—covering 16,130.53 acres and 14,745.92 acres respectively—leased the coal rights in the entire 30,876.45 acres there designated for a term of ten years and as long thereafter as coal is produced in paying quantities. At this time the BIA, which had approved the permits and the leases, had prepared no environmental impact statement (EIS) or other environmental analysis.

On June 15, 1972, the day after the leases were approved, Westmoreland entered into contracts with four midwestern utility companies to supply some 77,000,000 tons of coal over a twenty-year period, to begin July 1, 1974. In November, 1972 Westmoreland filed an application with the USGS for approval of a mining plan covering operations for five years on some 770 acres of the leased land. The surface of this area has been acquired by Westmoreland, while most of the remaining acreage is owned by others, including appellants herein.[1] Upon obtaining consent from

---

* Honorable Martin Donald Van Oosterhout, Senior U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. During the pendency of this appeal, plaintiffs John R. Redding, Kenneth and Madge John and Orville John conveyed their surface interests to appellee Westmoreland and withdrew as plaintiffs in this litigation. Plaintiffs Bruce and Dorothy Cady likewise have conveyed, according to the affidavit of Bruce Cady, approximately one-half of their surface interests in

the USGS to engage in pre-mining activities, Westmoreland began construction of surface facilities required for coal mining.

The BIA issued a draft EIS in October, 1973, and public hearings were held the following month. The final EIS— which was addressed only to the initial mining plan—was submitted to the Council on Environmental Quality in January, 1974, and this action was filed the following month.

The plaintiffs' complaint sets forth four claims. With respect to the plaintiffs' first, third, and fourth claims the court below denied the plaintiffs' request for a preliminary injunction and granted defendants' motion for summary judgment. Following a later hearing, the court also denied relief on plaintiffs' second claim and entered judgment thereon in favor of defendants. We reverse as to the first and second claims, remand to the district court for entry of an order which pertains to the subject matter of the first and second claims and is described more fully at the close of this opinion, and affirm as to the third and fourth claims. A more specific description of these claims is as follows:

Plaintiffs in their first claim contended that the prospecting permits and coal leases were invalid in that their approval

in the absence of an EIS violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* The trial court held that this claim was subject to summary judgment because (1) the approval of the prospecting permits did not constitute "major federal actions" within the meaning of NEPA, 42 U.S.C. § 4332(C); (2) NEPA was not intended to be applied retroactively, so that the Tenth Circuit decision in *Davis v. Morton,* 469 F.2d 593 (10th Cir. 1972), reversing the court below and holding that an EIS was required for leases on Indian lands, should not invalidate the leases here, particularly where the defendants had relied on the district court opinion in their actions; and (3) the federal defendants had issued an EIS and therefore have complied with NEPA; and (4) plaintiffs were barred by laches.

Plaintiffs in their second claim asserted that the final EIS was inadequate, not only in content but in scope, since Westmoreland had contract commitments for coal deliveries spanning twenty years and had leased 30,876 acres of land, whereas the EIS dealt only with a mining plan which covered but five years and 770 acres. The court, in ordering that judgment be entered in favor of defendants, held (1) that the final EIS met all the requirements of NEPA;

the leased area to Westmoreland; they have, however, indicated their intention to continue with this litigation, either as named plaintiffs or as members of Friends of the Earth, another named plaintiff. Appellee Crow Tribe disputes the substance of the Cady affidavit, claiming that as a result of the conveyance, the Cadys were left with no surface interests within the leased area.

We need not resolve this issue, since even the departure of the Cadys would not moot this lawsuit. Edward M. Dobson, an original named plaintiff, has submitted an affidavit which states that he is presently a resident of Sarpy Creek, Big Horn County, Montana, living on the ranch of J. T. Redding, which is within the leased area. He asserts that the "damage will include permanent destruction of the land which is strip mined, permanent damage to the underground water system upon which the grazing lands in the region depend for ˙ sub-irrigation, degradation of surface waters and of air quality in the region, intru-

sion of noise, interference with wildlife, aesthetic damage, and permanent impact on the quality of life in the whole region. . . ." affidavit, March 27, 1975. Such allegations indicate that appellant Dobson may have suffered an injury to interests reflecting aesthetic, conservational, and economic values distinct from his general interest in advancing the cause of preserving the environment. Clearly appellant Dobson alleges he is among those injured in fact. This provides him with sufficient standing to maintain this action and to deprive it of mootness in its entirety. Furthermore, appellant Friends of the Earth has standing to sue on behalf of those of its members who claim that they will suffer similar injuries if the coal leases are not invalidated. *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The complaint sufficiently alleges such injuries to certain members of Friends of the Earth. See the discussion of standing pp. 792–793 *infra.*

(2) that because the substance of plaintiffs' claims were before the approving authority as a part of the EIS, it was not deficient; and (3) that plaintiffs lacked standing to challenge the sufficiency of the EIS in that they were beyond the zone of interests to be protected by NEPA, since the Secretary of the Interior in approving the leases in his fiduciary capacity was required by the Act to consider only environmental impacts which might adversely affect the Indians.

Plaintiffs' third claim, that the leases were invalid since they violated certain regulations of the BIA, was held subject to summary judgment on the grounds that plaintiffs (1) lacked standing to sue on this issue; (2) failed to exhaust available administrative remedies; and (3) were barred by laches.

The court also granted summary judgment against plaintiffs on their fourth claim, that the leases were invalid since the United States, rather than the Crow Tribe owned the coal affected by the leases. The court reasoned that (1) none of the plaintiffs had a colorable claim to the leased coal rights and hence none had the personal stake necessary for standing; (2) even if plaintiffs had standing, litigation to determine the ownership of the coal rights was barred by sovereign immunity; and (3) the Crow Tribe did in fact own the coal rights.

We will discuss the first and second claims together; Thereafter the third and fourth claims will be treated separately. To simplify our presentation no attempt will be made to deal with each and every position taken by the lower court; rather our discussion is directed to, and organized around, only those issues which we believe are necessary to the proper disposition of these claims.

### I. First and Second Claims.

#### A. Preliminary Questions: Standing and Laches.

##### (1) Standing.

■ Appellants base their standing to sue on § 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 702, which provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

The Supreme Court has held that persons have standing to seek judicial review of federal agency action under § 10 where they allege that the challenged action has caused them "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated" by the statute which was allegedly violated. *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Injuries of a noneconomic nature to widely-shared aesthetic and environmental interests, as well as economic injuries, can amount to an "injury in fact" sufficient for standing under § 10. *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), *cited with approval in United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Appellants here allege injury to both environmental and economic interests which are within the "zone of interests" to be protected by NEPA. *United States v. SCRAP, supra,* 412 at 686 n. 13, 93 S.Ct. 2405; *cf. Lathan v. Brinegar,* 506 F.2d 677 (9th Cir. 1974); *National Forest Preservation Group v. Butz,* 485 F.2d 408, 410 (9th Cir. 1973).

■ This conclusion is not altered either by the fact that Indians were parties to the leases being attacked or by the fact that the Secretary of the Interior acted in his capacity as a fiduciary for such Indians in approving the leases. NEPA's stated purpose is to "assure for *all Americans* safe, healthful, productive, and esthetically and culturally pleasing surroundings . . ." 42 U.S.C. § 4331 (b)(2). (Emphasis added). Prior judicial interpretations of NEPA, moreover, give no indication that major federal actions primarily pertaining to Indi-

ans were to be immune from environmental challenges by all but such Indians. This court has stated that "[e]nvironmental protection is a part of every federal agency's mandate; the Act requires 'agencies to consider environmental issues just as they consider other matters within their mandates.'" *Lathan v. Brinegar,* 506 F.2d 677, 689 (9th Cir. 1974), *citing Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971). (Emphasis in original). The *Calvert Cliffs* court concluded that agency duties under NEPA are "not inherently flexible" but instead "must be complied with to the fullest [statutory] extent, unless there is a clear conflict of statutory authority." 449 F.2d at 1115. A like approach was taken by the Tenth Circuit in *Davis v. Morton,* 469 F.2d 593, 596 (10th Cir. 1972).[2]

To restrict standing, as did the lower court, to institute an environmental challenge to the Crow Tribe would limit standing under the circumstances of this case to a group having a strong economic incentive to alter substantially the environment. NEPA is not such a false promise.

(2) Laches.

We also conclude that the trial court in its disposition of the first claim erred in its determination that the appellants were barred by laches. Laches, an equitable defense, "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *Lathan v. Brinegar, supra,* 506 F.2d at 691–92. Neither element is present here.

■ The leases were granted in June, 1972 and the preparation of the EIS began early in 1973. We cannot say that it was a lack of diligence for appellants to

refrain from commencing an action to challenge the adequacy of the EIS until they could ascertain its contents. Appellants were entitled to assume that federal agencies would comply with the requirements of NEPA. *Environmental Defense Fund v. TVA,* 468 F.2d 1164, 1182 (6th Cir. 1972).

Moreover, Westmoreland was put on notice of appellants' position well before this suit was instituted. Appellants presented their views with respect to the inadequacy in scope and content of the draft EIS during public hearings in November, 1973. Also several environmental groups, including Friends of the Earth, filed suit in the district court for the District of Columbia on June 13, 1973 to require the federal government to issue a comprehensive impact statement covering all aspects of coal and power development in the Northern Great Plains region, the effect of which would be to halt further mining development there pending such an analysis. Westmoreland and the Crow Tribe intervened in that litigation. (The Court of Appeals for the District of Columbia Circuit recently reversed a grant of summary judgment in favor of the defendants and remanded the case to the district court to give the Secretary of the Interior the opportunity to determine whether an EIS was required in light of certain tests enunciated by the appellate court. *Sierra Club v. Morton,* 514 F.2d 856 (D.C. Cir. 1975)).

■ Westmoreland also failed to prove that any prejudice to which it may be subjected by reason of this suit resulted from reliance on appellants' inaction. The ultimate basis for the sums expended by Westmoreland was its entry into the twenty-year contracts to supply 77,-000,000 tons of coal; those obligations were incurred on the day after the leases were signed in June, 1972. Its commitments under the contracts to begin delivery of coal by July, 1974 necessarily

---

**2.** While the Tenth Circuit did not discuss the question of standing, the trial court found that "[p]laintiffs have alleged sufficient interests, economic and otherwise, to have standing to sue." 335 F.Supp. 1258, 1260 n. 2 (D.N.M. 1971).

locked Westmoreland into a construction and site development schedule which existed independent of any action or inaction by appellants.

■ On these facts the defense of laches is not available. This conclusion is strengthened by the fact that laches is not favored in environmental litigation. That is,

> [Laches] . . . has received a lukewarm reception in suits presenting environmental questions, for not only will others than the plaintiff suffer the possible environmental effects, but the agency will escape compliance with NEPA, a result not to be encouraged.

*Minnesota PIRG v. Butz,* 498 F.2d 1314, 1324 (8th Cir. 1974).

The public has an interest in compliance with NEPA that should not be impaired lightly.[3] Liberal rules with respect to standing do not require that the doctrine of laches be treated more hospitably.

### B. Approval of Leases as Major Federal Action.

■ To succeed in their first claim the appellants must not only establish their standing to sue and surmount the defense of laches but also establish that the approval by the Secretary of Interior of coal leases covering 30,876 acres of land constituted "major federal action" within the meaning of 42 U.S.C. § 4332(a)(C). The lower court avoided reaching this issue. This was error. We are persuaded by *Davis v. Morton,* 469 F.2d 593 (10th Cir. 1972) that the approval in this case was "major federal action" which requires the preparation of an EIS that satisfies the mandate of NEPA. Neither the status of Indians nor the manner in which their lands are held in trust justifies removing from the

"major federal action" category the 1972 approval of the leases in this case.

Inasmuch as no EIS was prepared until 1973 and its coverage was limited to the 770 acres embraced in the mining plan, it becomes necessary to determine whether this EIS satisfies the mandate of NEPA with respect to the Secretary's approval of the leases. The heart of the appellant's second claim is that it does not. To this issue we now turn.

### C. Adequacy of the EIS Covering 770 Acres for Approval of the Leases.

(1) Standard of Review.

■ Our decisions make clear that the adequacy of an EIS must be reviewed against a procedural standard. Thus the "without observance of procedure required by law" standard of 5 U.S.C. § 706(2)(D) rather than the "arbitrary, capricious, an[d] abuse of discretion" standard of § 706(2)(A) is the proper measure. *Lathan v. Brinegar,* 506 F.2d 677 (9th Cir. 1974). We also have recognized that this procedural standard "is less helpful in reviewing the sufficiency of an EIS than one might wish." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir. 1974). The standard presently is more ad hoc in character than might be thought proper. Nonetheless, we have no difficulty in applying it to this case.

(2) Application of the Procedural Standard.

■ NEPA requires that an EIS be prepared in "every recommendation or report on . . . major Federal actions" and that the statement "shall accompany the proposal through existing agency review processes." 42 U.S. § 4332(2)(C). These requirements further the purpose of the Act to require officials to consider environmental issues in determining whether the actions they

---

**3.** Thus prevailing judicial sentiment is to the effect that " '[t]he tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency.' " *Environmental Defense Fund v. TVA,* 468 F.2d 1164, 1183

(6th Cir. 1972), quoting with approval, *City of New York v. U. S.,* 337 F.Supp. 150, 160 (E.D. N.Y.1972); *Jones v. Lynn,* 477 F.2d 885, 892 (1st Cir. 1973); cf. *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1119 (1971).

contemplate should be undertaken. An ex post facto justification generally is not an acceptable substitute, as "NEPA . . . does not authorize defendants to meet their responsibilities by locking the barn door after the horses are stolen." *Lathan v. Volpe,* 350 F.Supp. 262, 266 (W.D.Wash.1972), *aff'd in part and rev'd in part,* 455 F.2d 1111 (9th Cir. 1971); *see* 40 C.F.R. § 1500.7(a); *Conservation Society of Southern Vermont, Inc. v. Sec'y of Transportation,* 508 F.2d 927 (2d Cir. 1974). That the filing of an EIS should precede rather than follow federal agency action has been consistently recognized by the courts.[4]

 In this respect the EIS covering the 770 acres is not adequate. It did not "accompany" the submission by the Secretary. This inadequacy is not excused by the existence of the lower court decision in *Davis v. Morton* which held

approvals by the Secretary of leases of Indian land not to be "major federal action." Reliance on that decision in the face of the comprehensive language of the statute fails to elicit the sympathy which acceptance of the defendants' proffered excuse would require.[5] Nor does failure to accept the excuse constitute retroactive application of NEPA. All the significant actions in this case occurred subsequent to January 1, 1970, the effective date of NEPA.[6]

Nonetheless the defendants insist that the EIS pertaining to the mining plan covering operations for five years on 770 acres of leased land is all that is required because numerous authorities recognize that under proper circumstances an EIS need not be prepared covering an entire project when an adequate EIS covering a discrete phase or segment thereof has been prepared.[7] This is such an in-

4. *See Minnesota PIRG v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 463 F.2d 783 (1971); *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir.), *cert. denied sub nom., Fugate v. Arlington Coalition on Transportation,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *National Helium Corp. v. Morton,* 455 F.2d 650 (10th Cir. 1971); *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

5. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973). This was, in fact, one of the few cases in which the failure to adhere strictly to the timing requirements of NEPA was excused; it is readily distinguishable from the situation before us. In that case, the failure to prepare an EIS occurred at a low administrative level. We held that there had been no prejudicial failure to comply with NEPA since (1) a written explanation of the decision made without the benefit of the EIS demonstrated that environmental factors had been considered; and (2) the omission was corrected soon enough that the EIS was available to decision-makers at the higher levels. 485 F.2d at 412.

6. Some courts have refused to give NEPA retroactive application. *See e. g., San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973); *Ragland v. Mueller,* 460 F.2d 1196 (5th Cir. 1972); *Brooks v. Volpe,* 319 F.Supp. 90 (W.D.Wash.1970), *rev'd on other grounds,* 460

F.2d 1193 (9th Cir. 1972); *Investment Syndicates, Inc. v. Richmond,* 318 F.Supp. 1038 (D.Or.1970); *Pennsylvania Environmental Council v. Bartlett,* 315 F.Supp. 238 (M.D.Pa. 1970).

Other courts, however, have held the provisions of the Act to be applicable to projects already initiated at its effective date. *See, e. g., Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289 (8th Cir. 1972); *Arlington Coalition on Transportation v. Volpe,* 458 F.2d (4th Cir.), *cert. denied sub nom., Fugate v. Arlington Coalition on Transportation,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Calvert Cliffs' Coordinating Comm., Inc. v. Atomic Energy Comm'n.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); *Lathan v. Volpe,* 455 F.2d 111 (9th Cir. 1971); *Greene County Planning Bd. v. Federal Power Comm'n,* 455 F.2d 412 (2d Cir. 1972); *Citizens for Mass Transit Against Freeways v. Brinegar,* 357 F.Supp. 1269 (D.Ariz.1973); *Nolop v. Volpe,* 333 F.Supp. 1364 (D.S.D.1971); *see also Environmental Law Fund v. Volpe,* 340 F.Supp. 1328 (N.D.Cal.1972).

7. *See, e. g., Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974) [aqueduct and collection system constituted "major federal action" in itself and was not a mere increment of larger water collection development, and diversion project]; *Trout Unlimited v. Morton,* 509 F.2d

stance, the defendants assert. Therefore, continue the defendants, the only issue is whether the EIS before us is adequate with respect to the mining plan to which it was addressed.

We disagree. While it is true that each mining plan prepared for tracts within the leased area is to a significant degree an independent project which requires a separate EIS with respect to each, it is no less true that the breadth and scope of the possible projects made possible by the Secretary's approval of the leases require the type of comprehensive study that NEPA mandates adequately to inform the Secretary of the possible environmental consequences of his approval. Westmoreland's massive capital investment and extended contractual commitments present a situation in which "it would be irrational, or at least unwise, to undertake the first phase if

subsequent phases were not also undertaken." *Trout Unlimited, supra,* 509 F.2d at 1285.[8] However, even were this not true, it cannot be denied that the environmental consequences of several strip mining projects extending over twenty years or more within a tract of 30,876.45 acres will be significantly different from those which will accompany Westmoreland's activities on a single tract of 770 acres.

■■■ Under the circumstances of this case we, therefore, hold that an EIS must be prepared for the entire project contemplated by the leases which the Secretary approved in June, 1972. We also hold that each specific mining plan functionally equivalent to the 770-acre plan for which an EIS has been prepared must be accompanied by an adequate EIS. Our position is supported by numerous authorities.[9]

1276 (9th Cir. 1974) [EIS discussing only first of two phases of dam and reservoir project was sufficient where first phase was substantially independent of the second; EIS covering entire project would be necessary only where the dependency of the first phase on those to follow was "such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken"]; *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974) ["rule against segmentation for EIS purposes is not an imperative to be applied in every case"; here, dam and lock project was a separate viable entity and not a mere component, increment, or first segment of larger project and has been treated as such by Congress]; *Environmental Defense Fund, Inc. v. Armstrong,* 352 F.Supp. 50 (N.D.Cal. 1972), *supplemental opinion,* 356 F.Supp. 131 (N.D.Cal.1973), *aff'd,* 487 F.2d 814 (9th Cir. 1973) [so long as each major federal action— here, construction of New Melones Dam—was undertaken individually and not as indivisible part of integrated statewide system, EIS with respect to dam was sufficient and construction could continue in the absence of comprehensive study of area water project]; *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973) [as a practical matter it is necessary to permit the division of a state highway plan into segments for EIS purposes; court, however, will not consider as an appropriate segment for EIS one which has no independent utility.]

**8.** That the BIA considered a "segmented" method of EIS preparation sufficient need not

weigh heavily in our assessment of the demands of this situation, since "[a]n agency decision concerning NEPA requirements is not one committed to the agency's discretion by law within the meaning of the APA . . .". *Minnesota PIRG v. Butz,* 498 F.2d 1314, 1320 (8th Cir. 1974).

**9.** *See, e. g., Conservation Society of Southern Vermont, Inc. v. Sec'y of Transportation,* 508 F.2d 927 (2d Cir. 1974); *Scientists' Institute for Public Information v. Atomic Energy Comm'n.,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). In *Conservation Society* the Second Circuit upheld a lower court order requiring that within six months from the issuance by the Federal Highway Administration of a project EIS—dealing with the construction of twenty miles of highway—the agency was required to prepare a statement covering the development of the entire 280-mile corridor which might embrace the smaller stretch. The court agreed that the broader EIS should be prepared even though the ultimate construction of a superhighway of which the segment would be a part could be characterized only as a "long-range goal" or "expectation" and even though no actual plans for its construction existed.

In a recent opinion of this court, *Scientists' Institute* has been described as "the leading case analyzing NEPA's 'irreversible commitment' language." *Friends of the Earth, et al. v. Coleman, etc.,* 513 F.2d 295 (9th Cir. 1974). According to the court:

[*Scientists' Institute*] held that an EIS had to be submitted prior to commencement of a

### D. Adequacy of EIS Covering 770 Acres for Approval of Five Year Mining Plan.

Implicit in our determination that an EIS must be prepared in conjunction with each separate and distinct mining plan is the holding that any approval thereof by a federal agency constitutes "major federal action." The magnitude of the undertakings embraced within the five year 770 acre plan before us convinces us beyond any doubt that approval by a federal agency of a substantially equivalent plan is "major federal action."

This conclusion requires that we examined the EIS prepared by the BIA to determine its adequacy. The appellants assert that it is deficient in six respects, *viz.* in its treatment of reclamation, ground water supply, water pollution, air quality, alternatives, and cost-benefit analysis.

■ Appellants characterize destruction of the land as the "most important single environmental impact" of the project and argue that in its discussion of reclamation, the EIS is lacking in data and is insufficiently analytical. We disagree. While we would have preferred a somewhat more detailed and better organized treatment of the proposed reclamation plans and although parts of the discussion are couched in the "conclusory form" we consider less than optimal,[10] we cannot say that the EIS is inadequate in this regard. Nor are we dislodged from this position because of the conflict in expert testimony concerning reclamation procedures and prospects at trial. As was said in *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973), "disagreement among experts will not serve to invalidate an EIS."

■ Appellants' attack upon the treatment of ground water supply and water pollution highlights the fact that the EIS concedes that certain environmental effects are not known. This does not necessarily undermine the adequacy of the statement. This court has explained:

> Neither § 102(2)(B) or (C) [42 U.S.C. § 4332(2)(B) or (C)] can be read as a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken. If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.

*Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 (9th Cir. 1973). We conclude that the treatment of ground water supply and water pollution in the EIS is adequate, as is its discussion of air quality, also attacked by appellants.

massive research and development program for breeder reactors. The court looked to the nature of the contemplated "research and development" program, which involved test projects and massive expenditures for the development and improvement of nuclear energy technology. The court concluded that the decision to go ahead with the "R & D" phase of AEC's proposed program would also effectively commit the agency to that program's subsequent implementation phase. Given the long lead time generally associated with the development of energy resources, the decision to implement the program's first phase would in reality foreclose reliance upon alternative energy sources to satisfy additional demand for energy in the future. (At p. 299).

This court, however, rejected the contention that the case before it fell within the *Scientists' Institute* rationale; two environmental organizations were attacking the decision to obtain fill for the construction of a highway segment from the site of a Peripheral Canal, proposed as part of the California Water project. The court held that while the presence of the highway fill excavations would most likely determine the path of the Peripheral Canal if it were built, this did not provide a sufficiently significant nexus to the highway excavations to warrant the preparation of an EIS covering the contemplated water transfer project before permitting highway construction to continue.

**10.** *Trout Unlimited v. Morton,* 509 F.2d 1276, 1284 (9th Cir. 1974).

We also decide that the EIS adequately deals with the subject of alternatives. *See Trout Unlimited, supra,* 509 F.2d at 1285–86. The EIS describes three basic alternatives—approval of the mining plan, modification of the present plan, and rejection of the plan—with subtopics where appropriate. For example, with respect to the "rejection" alternative, there are listed two courses of action which might ensue, i. e., an agency determination that coal mining could not be permitted anywhere on the leased area, or submission of a new mining plan by Westmoreland. In connection with the former, the EIS discusses (1) alternate sources of tribe income, (2) alternate supplies of coal, (3) non-coal energy alternatives, and (4) other alternatives. In connection with the latter, the statement discusses site, mining method, coal use, and transportation alternatives. The process of fractionating alternatives need not be pursued to the brink of triviality.

Finally, appellants characterize the EIS as inadequate for want of a cost-benefit analysis. In *Trout* we held that the absence of a numerically expressed cost-benefit analysis was not fatal. *Trout Unlimited, supra,* 509 F.2d at 1286. It is also not fatal here and for the same reasons. Throughout the EIS is recognition and discussion of the various advantages and detrimental effects of the project. The failure to affix numerical weights to each of these does not make the EIS inadequate in this case. We conclude, in sum, that although the EIS could be "improved by hindsight," it has satisfied the intent of the statute. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973).

## II. Third Claim.

In their third claim appellants assert that the leases must be invalidated because they were entered into and approved in violation of two regulations of the BIA, 25 CFR § 171.9(b) and 25 CFR § 177.4. In their complaint appellants also alleged violation of 25 CFR § 171.27, but they do not pursue this point on appeal. We reject these contentions and hold that the appellants lack standing to challenge 25 CFR § 171.9(b) and that the issues resting on 25 CFR § 177.4 are moot in view of the disposition we have made of the appellants' first claim.

### A. Standing to Challenge 25 CFR 171.9(b).

25 CFR § 171.9(b) provides an acreage limitation on coal leases, *viz.:*

(1) For coal, a lease shall ordinarily be limited to 2,560 acres. The Commissioner may, however, upon application, approve the combining of leases held by one or more lessees, or approve the issuance of a single lease for more than 2,560 acres in a reasonably compact form, if he shall find that the approval of such larger acreage is in the interest of the lessor and is necessary to permit the establishment or construction of thermal electric power plants or other industrial facilities on or near the reservation.

The coal leases before us involve 14,745.92 and 16,167.26 acres, respectively, and there is no evidence that the larger acreage will be utilized to construct power plants on or near the Crow reservation.[11]

Our conclusion that the appellants lack standing to challenge a violation of 25 CFR § 171.9(b) is rooted in the fact that they can suffer no "injury in fact" as a result of this violation that is separate and apart from the alleged injuries we have held sufficient to enable appellants to litigate their first and second claims. These alleged injuries

---

11. According to the EIS, "It is the stated intent of Westmoreland Resources to mine Sarpy Creek coal and market it at midwestern power plants primarily along or near the Mississippi River. The plants furnish electrical power to customers of four midwestern utility companies located in the States of Iowa, Minnesota, Wisconsin, Illinois and South Dakota." EIS at 6.

made it possible for the appellants to attack the *existence* of the leases. If the injuries exist in fact, they also will exist without regard to whether the mining operations are conducted under twelve leases of 2,560 acres apiece or under two leases of 14,745.92 and 16,167.-26 acres respectively. In either event, the injuries of which the appellants complain are the same; in neither event have the appellants alleged an injury in fact attributable to the *size* of the leases.

### B. Mootness of the Technical Assessment Question.

25 CFR § 177.4(a)(1) provides:

In connection with an application for a permit or lease, the superintendent shall make, or cause to be made, a technical examination of the prospective effects of the proposed exploration or surface mining operations upon the environment. . . .

No technical assessment pursuant to 25 CFR § 177.4 was submitted prior to the approval of the leases in June, 1972. However, the assessment was subsequently undertaken and was submitted in the summer of 1973; its adequacy is not challenged here.

■ Given the present posture of the case, we reach neither the question of whether appellants have standing to challenge the failure to conduct a timely technical assessment nor that of the effect of such a delay. Since the approval of the leases must now be re-evaluated in the light of the comprehensive EIS, the completed technical assessment will be available to the decision-makers at the appropriate time. We conclude, then, that appellants' claim with respect to the § 177.4 violation has been mooted by the disposition of this appeal.

### III. Fourth Claim.

■ Appellants assert finally that the leases are invalid on the ground that

the United States rather than the Crow Tribe holds legal title to the coal rights and hence that the latter had no right to lease them. We do not reach the merits of the ownership question since we hold that appellants lack standing to sue.

■ To permit them to litigate the issue of the disputed ownership rights would have the effect of an action to quiet title. But appellants themselves make no claims of interest in the coal rights and it is hornbook law that in an action to quiet title, a plaintiff must succeed on the strength of his own title and not on the weakness of his opponent's.

### IV. Disposition of Appellants' Claims.

■ Because of the issues above expressed we dispose of the claims before us in the following manner. The district court's grant of summary judgment in favor of appellees is affirmed as to the appellants third and fourth claims. As to the first and second claims it is reversed. We remand to the district court and direct that it enter an order (1) which declares that the approval of the leases was "major federal action" which requires the preparation of an EIS that satisfies the mandate of NEPA, and that the EIS prepared in conjunction with the five-year mining plan on the 770-acre tract was not adequate for this purpose; and (2) which enjoins all future operations under the leases, except those taken pursuant to, and authorized by, the five-year mining plan on the 770 acres approved by the USGS. The injunction shall be effective pending preparation of an adequate EIS covering the entire project and upon the basis of which the Secretary must reconsider his approval of the leases. In reconsidering his approval and in considering any future mining plans, the Secretary must ignore investments or commitments made by Westmoreland under the five-year plan on the 770-acre tract.[12]

---

12. Although failure to comply with NEPA will ordinarily call for an injunction halting the challenged action until the Act's requirements are met, in unusual circumstances an application of traditional equitable principles may justify denial or limitation of injunctive relief.

Affirmed in part and reversed and remanded in part.

*See Alpine Lakes Protection Society v. Schlapfer,* 518 F.2d 1089 (9th Cir. 1975). We have concluded that in the peculiar circumstances of this case it would not be appropriate to enjoin operations under the five-year mining plan on the 770-acre tract. An EIS adequate in all respects except failure to consider the total project was prepared and considered in conjunction with the decision to approve the five-year plan for the 770-acre tract. The determination to approve this plan involved a properly informed evaluation of the decision to commit these coal resources for removal. As noted *supra,* the EIS adequately discussed the alternative of no mining, and there is no sug-gestion that the proper officials failed to give due consideration to this alternative. So long as Westmoreland's investments and commitments are not considered in determining whether to approve either the leases themselves or any future mining plans, no NEPA policy would be served by halting operations under the five-year plan on the 770-acre tract. For these reasons we have concluded that an injunction against the approved mining on the 770-acre tract would be punitive, rather than remedial. *See Hartford-Empire Co. v. United States,* 323 U.S. 386, 435, 65 S.Ct. 373, 89 L.Ed. 322 (1945).