MR. JUSTICE HASWELL
dissenting:
The decision of the Court today deals a mortal blow to environmental protection in Montana. With one broad sweep of the pen, the majority has reduced constitutional and statutory protections to a heap of rubble, ignited by the false issue of local control.
This case does not concern local approval of subdivision plats by county commissioners under the Subdivision & Platting Act. Neither the county commissioners nor the city-county planning board is a party to this litigation. Nobody claims that the county commissioners do not have the power of approval of subdivision plats in conformity with the Subdivision & Platting Act. State v. local control is simply a “red herring” in this case.
The real issues in this case concern the right of two essentially local environmental organizations whose members make substantial use of nearby public lands for recreational purposes to compel a state agency to conform to the requirements of the Montana Environmental Policy Act regarding an Environmental Impact Statement to the end that an adequate environmental assessment will be made and considered by the decision makers, be they local or state or whoever they may be. If they cannot, the inalienable right of all persons to a clean and healthful enfir-onment guaranteed by Montana’s Constitution confers a right without a remedy; the requirements of Montana’s Environmental Policy Act and related environmental legislation become meaningless and illusory; and the mandatory Environmental Impact Statement deteriorates into a meaningless gibberish, providing protection to no one. These issues are embodied in the three principal issues raised by the parties, viz. standing, the validity of the Environmental Impact Statement, and injunctive relief.
*487 In my view, the majority neatly sidesteps these real issues in this case. Instead, the majority decision effectively nullifies express state policy on environmental matters contained in the Montana Environmental Policy Act, House Joint Resolution 73 approved March 16, 1974, and substantially interferes with and limits the effective operation of the legislature’s Environmental Quality Council.
Because this Court has made a 180° turn from its original position, I set out the original decision of this Court for comparison. I believe the original decision is correct, legally sound, and effectuates the purposes and objective of Montana’s Constitution and its statutes relating to the environment.
* sk Me * * *
This is an action by the Montana Wilderness Association and the Gallatin Sportsmen’s Association, Inc., for declaratory and injunctive relief against a proposed subdivision development in Gallatin County known as Beaver Creek South. The district court of Lewis and Clark County entered summary judgment (1) that the environmental impact statement on the porposed subdivision was void, (2) ordering reinstatement of the prior sanitary restrictions on the proposed subdivision, and (3) enjoining further development of the proposed subdivision until the reimposed sanitary restrictions áre legally removed. One of the defendants and interven or appeal.
Plaintiffs in the district court were the Montana Wilderness Association, a Montana nonprofit corporation dedicated to the promotion of wilderness areas and aiding environmental causes generally, and Gallatin Sportsmen’s Association, Inc., a Montana nonprofit corporation organized for charitable, educational and scientific purposes including the conservation of wildlife, wildlife habitat and other natural resources.
Defendants are (1) the Board of Health and Environmental Sciences and, (2) the Department of Health and Environmental Sciences of the State of Montana. Intervenor Beaver Creek South, Inc. is a Montana corporation and the developer of the *488 proposed subdivision. The Montana Environmental Quality Council, a statutory state agency, appeared in the district court as amicus curiae.
Beaver Creek South is located in the canyon of the West Galla-tin River adjacent to U.S. Highway 191 about seven miles south of Meadow Village of Big Sky of Montana. Beaver Creek crosses a portion of the property for about one-quarter mile along the north side. The general area where the proposed subdivision is located is a scenic mountain canyon area presently utilized as a wildlife habitat and a grazing area for livestock. Beaver Creek supports a salmonoid fishery. A two lane public highway, U.S. 191, runs through the canyon.
The developer Beaver Creek South, Inc., hereinafter called Beaver Creek, intends to subdivide approximately 95 acres into 75 lots for single-family and multi-family residences and a maximum of seven and one-half acres abutting U.S. Highway 191, for a neighborhood commercial area. The development of the subdivision is to be accomplished in two phases.
In 1973 Beaver Creek submitted to the Bozeman City-County Planning Board its subdivision plat contemplating Beaver Creek South for approval by the board and the county commissioners as required by sections 11-3859 through 11-3876, R.C.M.1947, the Montana Subdivision and Platting Act. In the spring of 1974 Beaver Creek filed the subdivision plat and plans and specifications for a water supply and sewer system with the Montana Department of Health and Environmental Sciences (hereinafter called the Department) for review and approval as required by sections 69-5001 through 69-5009, R.C.M.1947, the Sanitation in Subdivisions Act. Section 69-5003(2)(b) provides that a subdivision plat may not be filed with the county clerk and recorder until the Department has certified “that it has approved the plat and plans and specifications and that the subdivision is subject to no sanitary restriction”.
In April 1974 the Department circulated a “draft” environmental impact statement on the proposed subdivision in order to *489 obtain comments on the proposal pursuant to section 69-6504 (b)(3), R.C.M.1947, of the Montana Environmental Policy Act (MEPA). Written comments were received and the Department issued its “final” environmental impact statement in June 1974. The following month plaintiff Associations commenced this action seeking a permanent injunction against the Department’s removal of sanitary restrictions on the proposed Beaver Creek South. The Associations alleged failure of compliance with subdivision laws, administrative rules, Environmental Quality Council guidelines, and MEPA. The district court issued a temporary restraining order and an order to show cause. The Department and the Associations entered into a stipulation vacating the show cause hearing and the Department revised its final environmental impact statement, submitting a copy to the district court in October 1974. This revised final environmental impact statement is hereinafter called the revised EIS.
Meanwhile, in September 1974, Beaver Creek was granted leave to intervene. Motions to dismiss and briefs were filed, and on February 11, 1975, the district court ordered the temporary restraining order be dissolved, and the Associations be given an opportunity to file an amended complaint seeking a declaratory judgment on any impact statement other than the one filed in June 1974. In its memorandum and order, the district court found the Associations had standing to sue a state agency, but the Department must be given an opportunity to exercise its discretion and that an injunction would lie “only after the Department has acted unlawfully”.
On February 14, 1975 the Department conditionally removed the sanitary restrictions on Beaver Creek South.
On February 21, 1975, plaintiffs filed their second amended complaint seeking: (1) declaratory judgment that the Revised EIS of the Department was inadequate in law; (2) a permanent injunction prohibiting Beaver Creek from selling any of the lots or further developing Beaver Creek South until compliance with the laws of Montana was effected; and (3) a mandatory injunc *490 tion ordering the Department to reimpose sanitary restrictions on Beaver Creek South.
The focus of the second amended complaint is that the Revised EIS does not comply with legal requirements of MEPA in these particulars:
(1) The Revised EIS does not disclose that the Department used to the fullest extent possible a systematic, interdisciplinary approach as required by section 69-6504(b)(l), R.C.M.1947.
(2) The Revised EIS does not include a detailed statement of alternatives to the proposed action nor were such alternatives studied, developed or described to the fullest extent possible as required by section 69-6504(b)(3)(iii) and 69-6504(b)(4), R.C.M. 1947.
(3) The Revised EIS does not contain a detailed statement of the relationship between local short-term uses of man’s environment and the maintenance and enhancement of long-term productivity as required by section 69-6504(b)(3)(iv), R.C.M.1947.
(4) The Revised EIS does not include to the fullest extent possible a detailed statement of the environmental impact of the proposed subdivision as required by section 69-6504(b)(3)(i), R.C.M.1947.
(5) The Revised EIS contains no adequate consideration of the full range of the economic and environmental costs and benefits of the alternative actions available.
Defendants and intervenor filed motions to dismiss the second, amended complaint. This complaint was further amended; the Environmental Quality Council was granted leave to file a brief as amicus curiae; briefs were filed by all parties; and the matter was submitted to the district court for decision.
The district court considered the motions to dismiss as motions for summary judgment under Rule 12(b)(6), M.R.Civ.P. and considered matters outside the pleadings, principally interrogatories and answers.
On August 29, 1975 the district court issued its opinion and *491 declaratory judgment. In substance the district court held the plaintiffs have standing to prosecute this action, that the Revised EIS does not meet statutory requirements in various particulars, and plaintiffs are entitled to injunctive relief. Judgment was entered accordingly.
Defendant Department of Health and Environmental Sciences and intervenor Beaver Creek South, Inc. appeal from the judgment.
The issues can be summarized in this fashion:
1) Do plaintiff Associations have standing to maintain this action?
2) Does the Revised EIS satisfy the procedural requirements of the Montana Environmental Policy Act (MEPA)?
3) Are plaintiff Associations entitled to injunctive relief?
Appellants challenge the standing of the Associations to bring this suit. Appellants’ arguments fall into three main categories: a) that the Associations have suffered no cognizable injury; b) that any injury suffered or threatened is indistinguishable from the injury to the public generally; and c) that neither MEPA, the Montana Administrative Procedure Act, nor any other statute grants standing to these Associations to sue agencies of the state.
Initially, the question of environmental standing under MEPA is one of first impression in Montana. Therefore, the Associations and amicus curiae have presented this Court with numerous authorities from other jurisdictions on the issue of environmental standing. We find none are controlling as to the question before us, but a brief review of such authorities aids in the illumination of the determinative factors regarding this issue.
The Associations urge this Court to adopt the rationale of the federal courts in finding environmental standing because the relevant portions of MEPA in issue here are patterned virtually verbatim after corresponding portions of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 through 4347, (NEPA).
*492 In the federal courts, citizen challenges to alleged illegal agency action are often brought pursuant to the federal Administrative Procedure Act, 5 U.S.C. §§ 701 through 706. The companion cases of Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184, 188; and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), established the federal two-pronged test for standing to sue administrative agencies. The United States Supreme Court held that persons have standing to obtain judicial review of federal agency action under the federal Administrative Procedure Act where they allege that the challenged action causes them injury in fact and where the alleged injury is to an interest “arguably within the zone of interests to be protected or regulated” by the statutes that the agencies are claimed to have violated.
Data Processing and Barlow did not concern environmental matters, but such a case was presented in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, 641 (1972). In Sierra Club, a, conservation organization alleged its “special interest” in conservation and sound management of public lands, and sued the Secretary of the Interior for declaratory and injunc-tive relief against the granting of approval or issuance of permits for commercial exploitation of a national game refuge area in California. Petitioner invoked the judicial review provisions of the federal Administrative Procedure Act. The Supreme Court commenced its discussion of standing with this statement:
“ * * * Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a ‘personal stake in the outcome of the controversy,’ Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678, as to ensure that ‘the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.’ Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, 962. Where, *493 however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.”
The Supreme Court held that petitioner lacked standing solely because it did not sufficiently allege “injury in fact” to its “individualized interests”, that is, its individual members. Thus the Court did not reach the question of whether petitioner satisfied the “zone of interest” test.
In United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254, 269 (1973), proceedings were brought against the Interstate Commerce Commission (ICC) to enjoin the enforcement of certain administrative orders. Plaintiff organization alleged injury in that each of its members used the natural resources in the area of their legal residences for camping, hiking, fishing, sightseeing, and other recreational and aesthetic purposes. The alleged illegal activity was that the ICC failed to include with its orders a detailed environmental impact statement as required by NEPA. The Court found the allegations of the complaint with respect to standing were sufficient to withstand a motion to dismiss in the district court. The Court also reiterated from Sierra Club that “injury in fact” is not confined to economic harm:
“* * * Rather, we explained [in Sierra Club] . ‘Aesthetic and environmental well-being, like economic well-being, are important ingredients in the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.’ * * Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those resources suffered the same harm, deprives them of standing.”
*494 It was undisputed that the “environmental interests” asserted, by plaintiff were within the “zone of interests” to be protected or regulated by NEPA, the statute claimed to have been violated.
Sierra Club and SCRAP underscore the fact that in the federal courts environmental standing has developed in the statutory context of the federal Administrative Procedure Act.
The lower federal courts have, of course, followed the “injury in fact” and “zone of interest” test. For example, in the Ninth Circuit Court: National Forest Preservation Group v. Butz, 485 F.2d 408 (9 Cir., 1973); Cady v. Morton, 8 ERC 1097, 527 F.2d 786 (9 Cir., 1975); City of Davis v. Coleman, 521 F.2d 661 (9 Cir.; 1975).
Here, the Associations also cite several cases from California and Washington in support of their standing argument. The experience in the state of Washington has some pertinence to our inquiry. Washington’s State Environmental Policy Act, Washington Revised Code, Ch. 43.21C (1974) (SEPA), is also modeled after NEPA and has been interpreted by the Washington courts in several cases. The leading case as to standing is Leschi Improvement Council v. Washington State Highway Commission, 84 Wash.2d 271, 525 P.2d 774, 786 (1974). . Washington’s SEPA, like MEPA, contains no express provision for judicial review at the behest of private parties. In Leschi petitioners obtained review of a state highway commission’s limited access and design hearings and of the commission’s environmental impact statement, not pursuant to any statutory grant of standing, but by way of certiorari in the state’s lower court. Petitioners also sought an injunction. The Washington Supreme Court held the petitioners had standing because they raised the question of whether a nonjudicial administrative agency committed an illegal act violative of fundamental rights. An illegal act was said to be one which is contrary to statutory authority. More .important, the court held that petitioners sufficiently alleged violation of a fundamental right because of the language in SEPA that each person has a “fundamental and inalienable right to a *495 healthful environment.” Washington Revised Code § 43.21C.020(3). This section schematically corresponds to MEPA section 69-6503(b), which recognizes that “each person shall be entitled to a healthful environment * * *
In Leschi four justices dissented. They objected to the standing of petitioners because:
“* * * Judicial review of the administrative proceeding involved, at the instance of persons standing in the position of the appellants, is not authorized by any statute or any doctrine of common law, and there is no suggestion that it is mandated by any provision of the state or federal constitutions.” (Emphasis supplied.)
Here, appellants suggest this Court follow certain Montana cases in denying standing on the ground that the Associations lack standing to enjoin public officers from acting. This argument fails to distinguish between the separate questions of standing and of injunctive relief. The particular issue of injunctions will be treated separately hereinafter.
In Montana, the question of standing to sue government agencies has arisen in the context of taxpayer and elector suits. State ex rel. Mitchell v. District Court, 128 Mont. 325, 339, 275 P.2d 642, 649, involved a complaint seeking to enjoin the secretary of state from certifying nominees for election to a certain office. This Court said:
“The complaint which the plaintiff * * * filed in the district court shows that his only interest is as a taxpaying, private citizen and prospective absentee voter. It wholly fails to show that he will be injured in any property or civil right. Thus does [his] own pleading show him to be without standing or capacity to invoke equitable cognizance of a purely political question * * (Emphasis supplied.)
Holtz v. Babcock, 143 Mont. 341, 380, 390 P.2d 801, 805, was an action- to enjoin the governor and other state officers from performing an agreement regarding an airplane lease. It was held that plaintiff lacked standing to sue as a citizen, resi *496 dent, taxpayer and airplane owner. On petition for rehearing the Court stated:
“* * * The only complaint a taxpayer can have is when [the alleged state action] affects his pocketbook by unlawfully increasing his taxes. Appellant here does not allege any particular injury which he personally would suffer.” (Emphasis supplied.)
In State ex rel. Conrad v. Managhan, 157 Mont. 335, 338, 485 P.2d 948, 950, the Court summarily stated:
“ * * * We hold that relators as affected taxpayers, have standing to bring a declaratory judgment action [against county assessors and the state board of equalization] concerning a tax controversy * * (Emphasis supplied.)
Chovanak v. Matthews, 120 Mont. 520, 525-527, 188 P.2d 582, 584-585, concerns an attack against the constitutionality of a statute rather than a challenge to particular agency action. However, we look to Chovanak for its general discussion of the principles of standing. There the plaintiff sued the state board of equalization for a declaratory judgment that a slot machine licensing act was constitutionally void. Plaintiff alleged he was a resident, citizen, taxpayer and elector of the county where the action was commenced. We quote Chovanak for the sound rules of jurisprudence enunciated:
“It is by reason of the fact that it is only judicial power that the courts possess, that they are not permitted to decide mere differences of opinion between citizens, or between citizens and the state, or the administrative officials of the state, as to the validity of statutes. * * *
“ * * * The judicial power vested in the district courts and the Supreme Court of Montana, by the provisions of the Montana Constitution extend to such ‘cases at law and in equity’ as are within the judicial cognizance of the state sovereignty. Article 8, secs. 3, 11. By ‘cases’ and ‘controversies’ within the judicial power to determine, is meant real controversies and not abstract differences of opinion or moot questions. Neither federal nor state Constitution has granted such power.
*497 “The only interest of the appellant in the premises appears to be that he is a resident, citizen, taxpayer and elector of the county * * *. He asserts no legal right of his that the said board has denied him, and sets forth no "wrong which they have done to him, or threatened to inflict upon him.
“Appellant’s complaint is in truth against the law, not against the board of equalization. He represents no organization that has been denied a slot machine license. He seeks no license for himself. In fact it appears from his complaint that slot machines, licensed or unlicensed, are utterly anathema to him. There is no controversy between him and the board of equalization.
“It is held in Montana, as it is held in the United States Supreme Court, and by courts throughout the nation, that a showing only of such interest in the subject of the suit as the public generally has is not sufficient to warrant the exercise of judicial power. * * *”
It is clear from these Montana cases that the following factors constitute sufficient minimum criteria, as set forth in a complaint, to establish standing to sue the state:
1) The complaining party must clearly allege past, present or threatened injury to a property or civil right.
2) The alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party.
3) The issue must represent a “case” or “controversy” as is within the judicial cognizance of the state sovereignty.
With the foregoing criteria in mind, we hold plaintiff Associations have standing to seek judicial review of the Department’s actions under MEPA.
First, the complaint alleges a threatened injury to a civil right of the Associations’ members, that is, the “inalienable * * * right to a clean and healthful environment”, Article II, Section 3, *498 1972 Montana Constitution. This constitutional provision, enacted in recognition of the fact that Montana citizens’ right to a clean and healthful environment is on a parity with more traditional inalienable rights, certainly places the issue of unlawful environmental degradation within the judicial cognizance.
We have studied appellants’ arguments that Article IX, Section 1, 1972 Montana Constitution, states that the legislature shall provide for the enforcement of the state’s duty to “maintain and improve a clean and healthful environment in Montana”, and the legislature shall provide for “adequate remedies” to protect it. We have studied the Constitutional Convention minutes surrounding Article IX and are aware the intent of the delegation was for the legislature to act pursuant to Article IX. But, we cannot ignore the bare fact that the legislature has not given effect to the Article IX, Section 1 mandate over a period of years. Moreover, the declaration of rights in Article II, the Article dealing with citizens’ fundamental rights, gives “All persons” in Montana a sufficient interest in the Montana environment to enable them to bring an action based on those rights, provided they satisfy the other criteria set forth.
Intervenors urge this Court to consider the lengthy dissent in the Washington Leschi case as persuasive authority that the plaintiff Associations lack standing. The portion of that dissent relied upon, deals with the proposition the petitioners there came under no statutory grant of standing and were therefore excluded from the courts in a SEPA case. However, that dissent actually supports our holding here. The dissent assails the purported statutory creation of a “fundamental right” in SEPA upon which standing may be founded, and argues that a fundamental right can only be derived from the fundamental law. We concur and find an inalienable, or fundamental, right was created in our fundamental law, Article II, Section 3, 1972 Montana Constitution.
Second, the complaint alleges on its face an injury to the Asso- ■ ciations which is distinguishable from the injury to the general *499 public. When the plaintiffs do not rely on any statutory grant of standing, as here, courts must look to the nature of the interests of plaintiffs to determine whether plaintiffs are in a position to represent a “personal stake in the outcome of the controversy” ensuring an “adversary context” for judicial review. Sierra Club v. Morton, supra; Chovanak v. Matthews, supra. Both Associations allege, in effect, that they are relatively large, permanent, nonprofit corporations dedicated to the preservation and enhancement of wilderness, natural resources, wildlife and associated concerns. Both Associations allege substantial use of the public lands adjacent to Beaver Creek South by their members for various recreational purposes. The Gallatin Sportsmen’s Association contributed to the Department’s Revised EIS by way of written comments to the draft environmental impact statement. These facts are sufficient to permit the Associations to complain of alleged illegal state action resulting in damage to the environment.
Third, there can be no doubt that unlawful environmental degradation is within the judicial cognizance of the state sovereignty. The constitutional provisions heretofore discussed and MEPA itself unequivocally demonstrate the state’s recognition of environmental rights and duties in Montana. The courts of the state are open to every person for the remedy of lawfully cognizable injuries. Article II, Section 16, 1972 Montana Constitution; Section 93-2203, R.C.M.1947.
Finally, we reiterate these Associations are citizen groups seeking to compel a state agency to perform its duties according to law. This concept is novel in Montana only insofar as it is raised here in the context of the state’s explicit environmental policy. Were the Associations denied access to the courts for the purpose of raising the issue of illegal state action under MEPA, the foregoing constitutional provisions and MEPA would be rendered useless verbiage, stating rights without remedies, and leaving the state with no checks on its powers and duties under that act. The statutory functions of state agencies under MEPA can *500 not be left unchecked simply because the potential mischief of agency default in its duties may affect the interests of citizens without the Associations’ membership. United States v. SCRAP, supra.
The second major issue concerns the adequacy of the Revised EIS filed by the Department on the Beaver Creek South subdivision.
Throughout the argument Beaver Creek has maintained that MEPA has no bearing upon the Department’s review of the proposed subdivision plant and an environmental impact statement is not required. If such statement is required, then Beaver Creek allies itself with the Department’s position. The Department concedes that an environmental impact statement is required, but contends its responsibilities under MEPA are circumscribed by other statutory authority. In both Beaver Creek’s and the Department’s arguments, the thrust is that subdivision review has been comprehensively provided for in two acts hereinbefore cited: the Subdivision and Platting Act and the Sanitation in Subdivisions Act. They allege the clear legislative intent of the Subdivision and Platting Act is to place final subdivision approval authority in the hands of local government (e.g., section 11-3866, R.C.M.1947), and the Department can interfere with town, city, or county subdivision approval only to the extent of its particular expertise and authority under the Sanitation In Subdivisions Act. Thus, they allege, if a Department environmental impact statement is required, it need deal in detail only with the environmental effects related to water supply, sewage disposal, and solid waste disposal.
Montana’s Environmental Policy Act was enacted in 1971 and is patterned after the National Environmental Policy Act. It is a broadly worded policy enactment in response to growing public concern over the innumerable forms of environmental degradation occurring in modern society. The first two sections of MEPA state:
“69-6502. Purpose of act. The purpose of this act is to declare *501 a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the state; and to establish an environmental quality council.”
“69-6503. Declaration of state policy for the environment. The legislative assembly, recognizing the profound impact of man’s activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urganization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the state of Montana, in co-operation with the federal government and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can coexist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Montanans.
“(a) In order to carry out the policy set forth in this act, it is the continuing responsibility of the state of Montana to use all practicable means, consistent with other essential considerations of state policy, to improve and co-ordinate state plans, functions, programs, and resources to the end that the state may —
“(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
“(2) assure for all Montanans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
“(3) attain the widest range of beneficial uses of the environ *502 ment without degradation, risk to health or safety, or other undesirable or unintended consequences;
“(4) preserve important historic, cultural, and natural aspects of our unique heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
“(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life’s amenities; and
“(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.
“(b) The legislative assembly recognizes that each person shall be entitled to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.”
These sections unequivocably express the intent of the Montana legislature regarding environmental policy.
But MEPA does more than express lofty policies which want for any means of legislative or agency implementation. Section 69-6504, R.C.M.1947, contains “General directions to state agencies” and provides:
“The legislative assembly authorizes and directs that to the fullest extent possible.
“(a) The policies, regulations, and laws of the state shall be interpreted and administered in accordance with the policies set forth in this act, and
“(b) all agencies of the state shall
“(1) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences •and the environmental design arts in planning and in decision making which may have an impact on man’s environment;
“(2) identify and develop methods and procedures, which will insure that presently unquantified environmental amenities and *503 values may be given appropriate consideration in decision making along with economic and technical considerations;
“(3) include in every recommendation or report on proposals for projects, programs, legislation and other major actions of state government significantly affecting the quality of the human environment, a detailed statement on —
“(i) the environmental impact of the proposed action,
“(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
“(iii) alternatives to the proposed action,
“(iv) the relationship between local short-term uses of man’s environment and the maintenance and enhancement of long-term productivity, and
“(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
“Prior to making any detailed statement, the responsible state official shall consult with and obtain the comments of any state agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate state, federal, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the governor, the environmental quality council and to the public, and shall accompany the proposal through the existing agency review processes. * * *”
The “detailed statement” described by subsection (b)(3) is referred to as the environmental impact statement, or EIS.
Appellants emphasize that the Subdivision and Platting Act was passed two years after MEPA, and this circumstance expresses a legislative intent that local review of environmental factors, particularly under sections 11-3863 and 11-3866, R.C.M.1947, obviates the necessity for departmental review. Such an interpretation, however, conflicts with the terms of MEPA, in section 69-6507, R.C.M.1947:
*504 “The policies and goals set forth in this act are supplementary to those set forth in existing authorizations of all boards, commissions, and agencies of the state.”
Had the legislature intended local review to replace the rigorous review required by responsible state agencies, it could easily have so stated. The existing statutes evince a legislative intent that subdivision decisions be made at the local planning level based upon factors with an essentially local impact, and that state involvement triggers a comprehensive review of the environmental consequences of such decisions which may be of regional or statewide importance.
An illustration of this interpretation is provided by a comparison of the provisions of MEPA, hereinbefore set forth, with certain provisions of the Subdivision and Platting Act. The statement of policy in the Subdivision and Platting Act contains a mandate to “require development in harmony with the natural environment”, section 11-3860, R.C.M.1947. Section 11-3863 (1), R.C.M.1947, requires local governing bodies to adopt regulations and enforcement measures for, inter alia, “the avoidance of subdivision which would involve unnecessary environmental degradation * * *.” Subsection (2) requires the department of community affairs to prescribe minimum requirements for local government subdivision regulations, including “criteria for the content of the environmental assessment required by this act.” Subsection (3) provides that this “environmental assessment” must be submitted to the governing body by the subdivider. Subsection (4) describes the environmental assessment which emphasizes research as to water, sewage, soil and local services. While these factors may be among the more significant immediate environmental problems created by a subdivision, an assessment of them does not approach the scope of the inquiry required by MEPA section 69-6504, R.C.M.1947.
Furthermore, there is no irreconcilable repugnancy between these acts which would render either the Subdivision and Platting Act or MEPA a nullity. It is suggested the district court’s