**WESTINGHOUSE ELECTRIC CORPORATION, Petitioner in 78–1188/89, 78–1894/95,**

**Scientists and Engineers for Secure Energy, Mid-Atlantic Legal Foundation, and Capital Legal Foundation, Petitioners in 78–1204 and 78–1892,**

**Allied-General Nuclear Services, Allied Chemical Nuclear Products, Inc. and General Atomic Company, Petitioners in 78–1993/94,**

**v.**

**UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent,**

**Natural Resources Defense Council, State of Texas, State of New York, State of Wisconsin, Intervenors.**

Nos. 78–1188, 78–1189, 78–1204, 78–1892, 78–1894, 78–1895, 78–1993 and 78–1994.

United States Court of Appeals, Third Circuit.

Argued Feb. 13, 1979.

Decided April 19, 1979.

Barton Z. Cowan (argued), Samantha Francis Flynn, Karl K. Kindig, Andrew M. Roman, Stuart A. Williams, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for petitioners in Nos. 78–1188, 78–1189, 78–1894 and 78–1895; John R. Erbey, Westinghouse Elec. Corp., Pittsburgh, Pa., of counsel.

Anthony C. Liotta, Acting Asst. Atty. Gen., James L. Kelley, Acting Gen. Counsel, Stephen F. Eilperin, Sol., Dirk D. Snel, John J. Zimmerman, Land & Natural Resources Div., Dept. of Justice, Richard S. Mallory (argued), Irwin B. Rothschild, III, Mark E. Chopko, Nuclear Regulatory Commission, Washington, D. C., for respondent.

Anthony Z. Roisman, Washington, D. C., argued, for intervenor, Natural Resources Defense Council, Inc.

Myrna P. Field, Mid-Atlantic Legal Foundation, Philadelphia, Pa., L. Manning Muntzing (argued), Perry B. Seiffert, Doub, Purcell, Muntzing & Hansen, Washington, D. C., for petitioners in Nos. 78–1204 and 78–1892; James R. Richards, Capital Legal Foundation, Washington, D. C., of counsel.

Bennett Boskey, Thomas S. Moore, Volpe, Boskey & Lyons, Washington, D. C., for petitioners in Nos. 78–1993 and 78–1994.

George C. Freeman, Jr., Donald P. Irwin, Hunton & Williams, Richmond, Va., for amici curiae, Baltimore Gas & Electric Co., et al.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen. of the State of New York, John G. Proudfit, Asst. Atty. Gen. of the State of New York, New York City, John L. Hill, Atty. Gen. of the State of Texas, Austin, Tex., Bronson C. La Follette, Atty. Gen. of the State of Wisconsin, Madison, Wis., for intervenor States of New York, Texas and Wisconsin; John F. Shea,

III, Asst. Atty. Gen. of the State of New York, and Charles E. Tennant, Legal Assistant, New York City, Richard Lowerre, Asst. Atty. Gen. of the State of Texas, of counsel.

Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

On December 23, 1977, the United States Nuclear Regulatory Commission (NRC) suspended for approximately two years its decisionmaking process regarding proposals for the recycling of spent nuclear fuel and the use in nuclear reactors of plutonium recovered from that fuel. This suspension was announced in an order terminating informal rulemaking and related licensing proceedings concerning this subject. In part, the decision to place a moratorium upon these deliberations was taken in deference to President Carter's stated objective of deferring domestic plutonium recycling while the United States initiated a multinational evaluation of alternative fuel cycles that would pose a lesser risk of international proliferation of nuclear weapons. Petitions for review were filed requesting us to set aside and enjoin the NRC's order on the grounds that, in terminating these proceedings, the NRC violated the Atomic Energy Act (AEA)[1] and the National Environmental Policy Act (NEPA).[2] Because we conclude that the NRC acted within the scope of its authority and that there is no requirement to have a NEPA statement at this time, the petitions for review will be denied.

## I.

For over two decades, the federal government, initially through the Atomic Energy Commission (AEC) and later through the NRC, a successor agency to the AEC,[3] has been exploring, together with the private sector, the feasibility of reprocessing spent nuclear fuel and employing the plutonium recovered from such fuel in nuclear reactors utilized to generate electricity.[4] Commer-

1. 42 U.S.C. §§ 2011–2296 (1976).

2. 42 U.S.C. §§ 4321–4347 (1976).

3. The AEC was dissolved by the Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801–5891 (1976), and its licensing and related regulatory functions were transferred to the newly-created NRC. See 42 U.S.C. § 5841(f) (1976). Other functions were taken over by the Energy Research and Development Administration and other federal departments.

4. The government began encouraging research and development in this field in 1957, and since then has spent approximately $100 million on the project. In 1960, Nuclear Fuel Services, Inc. began construction of a reprocessing plant at West Valley, New York, which operated commercially between 1966 and 1971. Allied-General Nuclear Services started construction of a reprocessing plant at Barnwell, South Carolina, in 1971, pursuant to a permit granted by the AEC. Also, three commercial light water-cooled nuclear power reactors have been authorized to operate with mixed oxide, or recycled, fuel.

The importance of the technology involved in this research, as well as the problems created, can be appreciated with a rudimentary understanding of the nuclear fuel cycle. Currently, the vast majority of nuclear power plants in this country, which now generate about 12 per-

cent of the nation's electricity, are fueled by slightly "enriched" uranium dioxide fuel. As it enters a reactor, the uranium in the fuel consists of about 3 percent uranium-235 and 97 percent uranium-238. A controlled nuclear chain reaction is then initiated, causing uranium-235 atoms to fission into lighter atoms and releasing heat that generates steam to drive the plant's electric generators. The chain reaction also transmutes some uranium-238 atoms into plutonium, and some of the plutonium also fissions. The fission products tend to impede the chain reaction, and before the uranium and plutonium are entirely expended, the spent fuel must be removed from the reactor and replaced with fresh fuel. The spent fuel, however, contains elements of uranium and plutonium which, if separated from the waste, reprocessed, and fabricated into new, mixed oxide nuclear fuel, would constitute a significant new source of energy. Besides alleviating the problem of safely disposing of radioactive waste, the recycling of plutonium would help conserve the world's limited uranium resources. For these reasons, the Commission and private industry have been exploring the commercial feasibility of constructing and operating the facilities necessary to implement this conversion process. However, the recycling of plutonium also presents a danger. As part of that process, plutonium must be isolated from the radioactive waste before being re-

cial implementation of the plutonium recycling process would have the advantages of conserving uranium resources and of alleviating the problem of disposing of radioactive wastes, but might also pose the dangers of a proliferation of nuclear weapons and the possible sabotage of reprocessing facilities. This is so because, unlike the slightly "enriched" uranium currently used in nuclear reactors, plutonium can be employed in the production of nuclear explosives and might be diverted to that end by foreign governments or by terrorists.[5]

Recognizing that a decision to implement a wide-scale program for the commercial recycling of plutonium constitutes a major federal action significantly affecting the environment, and thereby necessitating an environmental impact statement (EIS) in order to comply with § 102(2)(C) of NEPA,[6] the AEC in 1974 commenced work on a Generic Environmental Statement on the Use of Recycle Plutonium in Mixed Oxide Fuel in Light Water Cooled Reactors (GESMO).[7] Concomitant with the GESMO informal rulemaking proceeding, the Commission (this term will be used to include both the AEC and the NRC) conducted adjudicatory licensing proceedings on applications by private companies dealing with the construction and operation of nuclear fuel reprocessing plants, some of which were already pending when GESMO was undertaken. Among the applications before the Commission were those of Allied-General Nuclear Services (Allied-General) for a license to operate the nearly-completed fuel reprocessing plant that it had permission to construct at Barnwell, South Carolina, and of Westinghouse Electric Corp. (Westinghouse) for a license to construct a similar plant at Anderson, South Carolina.

One of the concerns expressed while the rulemaking and adjudicatory proceedings were progressing was that dangers to world security might ensue from the commercial reprocessing of nuclear fuel. For example, the AEC staff's first draft of GESMO, which was published on August 21, 1974,[8] prompted a number of critical comments by the public. These included a letter from the President's Council on Environmental Quality that was directed at GESMO's failure (a) to address the proliferation dangers, (b) to explore what safeguards were available, and (c) to weigh the possibility of developing alternative sources of energy.[9] In response to this criticism, the staff undertook to reassess its study and to supplement the draft GESMO with an analysis of proliferation risks and safeguards.[10] And, on October 28, 1976, President Ford discussed

combined into mixed oxide fuel. This plutonium may be used to produce nuclear weapons, and consequently it is feared that the widespread development of plutonium recycling facilities in this country and abroad may lead to nuclear proliferation as foreign governments and subversive groups divert plutonium to nonpeaceful uses. The plutonium recycling operation is described in greater detail in *National Resources Defense Council v. United States Nuclear Regulatory Commission (NRDC v. NRC)*, 539 F.2d 824, 830–832 (2d Cir. 1976), *vacated and remanded to determine mootness sub nom., Allied-General Nuclear Services v. NRDC*, 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978); *Mixed Oxide Fuel*, 40 Fed.Reg. 53056 (1975).

5. *See* note 4 *supra.*

6. 42 U.S.C. § 4332(2)(C) (1976).

7. The decision to compile GESMO was announced on February 12, 1974, and published in 39 Fed.Reg. 5356 (1974).

8. *See* 39 Fed.Reg. 30186 (1974).

9. *See NRDC v. NRC, supra*, 539 F.2d at 832–33.

10. In November, 1975, after an earlier announcement and the receipt of comments, the NRC published a policy statement declaring that a study of safeguard alternatives would be included in GESMO and weighed in NRC's final decision on the subject of wide-scale commercial recycling of plutonium. That statement also specified the procedures and schedule to be followed for GESMO hearings and set forth criteria under which interim licensing of nonexperimental, recycle-related activities would be considered. *See* 40 Fed.Reg. 53056 (1975), *corrected*, 40 Fed.Reg. 59497 (1975). Various environmental groups sought review of this policy statement in the Court of Appeals for the Second Circuit. That court affirmed the NRC's hearing procedures but held that the interim licensing of recycle-related activities on a commercial basis violated NEPA. The Supreme Court vacated and remanded that judgment for consideration of mootness after the NRC's order of December 23, 1977. *See NRDC v. NRC, supra.*

the risks entailed in plutonium recycling in a statement on nuclear policy. He declared that the nation "should pursue reprocessing and recycling in the future only if they are found to be consistent with our international [non-proliferation] objectives." [11]

President Carter disclosed his administration's policy concerning plutonium recycling on April 7, 1977. Noting with alarm the serious proliferation risks of plutonium recycling, the President stated that part of the government's response would be to "defer indefinitely the commercial reprocessing and recycling of plutonium produced in the U.S. nuclear power programs," and to sponsor an international nuclear fuel cycle evaluation (INFCE) program aimed at developing alternative processes with lower proliferation risks. [12]

11. Statement by the President on Nuclear Power Policy, reprinted in 12 Weekly Comp. of Pres. Doc. 1624, 1626 (1976).

12. Statement by the President on Nuclear Power Policy, reprinted in 13 Weekly Comp. of Pres. Doc. 502, 503 (1977). It was also announced that "(t)he plant at Barnwell, South Carolina, will receive neither federal encouragement nor funding for its completion as a reprocessing facility." Id. The Administration's policy was subsequently discussed at length by Dr. Nye, Deputy to the Undersecretary of State, in Nonproliferation: A Long-Term Strategy, 56 Foreign Affairs 601 (April, 1978).

13. On April 12, 1977, the Hearing Board ordered that hearings be postponed until further notice. That same day, the Public Interest Research Group (PIRG) submitted a motion to terminate GESMO, upon which the NRC staff deferred action pending receipt of guidance from the Hearing Board or the NRC. See App. 44a–47a. On May 3, 1977, the NRC directed the Hearing Board to certify the PIRG motion to the NRC. See 42 Fed.Reg. 22964 (1977).

14. See 42 Fed.Reg. 22964 (1977).

15. Mr. Eizenstat's letter stated in pertinent part:

The President believes that our goal of stopping the spread of nuclear weapons capability among non-weapons states can be significantly improved by a halt in purex reprocessing. Last April 7, he stated that the U.S. should "defer indefinitely the commercial reprocessing and recycling of the plutonium produced in U.S. nuclear power programs". The Administration has proposed

Almost immediately thereafter, a motion was filed to terminate the GESMO proceeding, and the NRC's GESMO Hearing Board postponed further hearings. [13] On May 3, 1977, the NRC announced its intention to reassess "the future course and scope of GESMO, the review of recycle-related applications, and the matter of interim licensing," and invited GESMO participants, the Executive Branch, and other interested persons to submit their views on the subject. [14] President Carter's position was explained on October 4, 1977, in a letter by Stuart Eizenstat, Assistant to the President for Domestic Affairs and Policy. [15] The NRC then solicited further public comment on the President's position and on several alternative courses of action. [16]

an accelerated research and development program to examine alternative fuel cycles not involving direct access to plutonium. The President has also asked other countries to join us in an International Nuclear Fuel Cycle Evaluation to examine alternative approaches to advanced nuclear technologies. The GESMO proceedings and related licensing requests may impact these non-proliferation initiatives. While the studies and analyses done by the Commission staff, if available in published form, may be of value to the International Nuclear Fuel Cycle Evaluation, the President believes that his non-proliferation initiatives would be assisted both domestically and internationally if the Commission were to terminate the GESMO proceedings. Specifically, the President believes that the following actions would be helpful in achieving the Administration's goals:
* Publication of the Commission's assessment of safeguards issues.
* Termination of staff reviews and hearings relating to recycle activities. (Continuation of these activities could lead other nations to question the United States commitment to deter commercial reprocessing and plutonium recycle.)
* Denial of interim licensing of fuel cycle facilities.
* Denial of interim licensing for use of mixed oxide fuel in reactors, except in small quantities for experimental purposes.
The letter is reprinted at 42 Fed.Reg. 57186 (1977).

16. See 42 Fed.Reg. 57185 (1977). The notice described four possible courses of action: (1) terminating GESMO and denying the related license applications; (2) continuing as before; (3) taking an intermediate course of action,

Thereafter, on December 23, 1977, the NRC issued an order terminating the GESMO proceeding as well as most proceedings relating to pending or future plutonium-recycle license applications. Among other things, the order also committed the NRC "to re-examine the above matter after the completion of the ongoing alternative fuel cycle studies, now expected to take about two years," and to publish shortly after the decision a statement of the reasons underlying the decision.[17] That statement, in the form of a Memorandum of Decision, was issued on May 8, 1978.[18]

Petitioners sought judicial review within the prescribed period of sixty days [19] following entry of the December 23 Order. Westinghouse filed petitions in this Court, which were assigned docket numbers 78–1188 and 78–1189, challenging the termination of both GESMO and the licensing proceedings with respect to its Anderson, South Carolina facility. Four days later, Allied-General (together with Allied Chemical Nuclear Products, Inc., and General Atomic Company) filed a similar petition in the United States Court of Appeals for the district of Columbia objecting to the cessation of GESMO and licensing proceedings concerning its Barnwell plant. On the same day, Scientists and Engineers for Secure Energy, Mid-Atlantic Legal Foundation, and Capital Legal Foundation (Scientists), filed a petition in this Court, which was assigned docket number 78–1204, seeking review only of the NRC's termination of GESMO.

Concerned that the December 23 Order might not be deemed final, the parties also took several protective actions after the May 8, 1978, Memorandum of Decision was issued. First, Allied-General petitioned the District of Columbia Court of Appeals for review. Subsequently, Westinghouse and Scientists filed new petitions for relief before this Court, docketed respectively as numbers 78–1895, 78–1894 and 78–1892. Allied-General's petitions are before us following their transfer from the Court of Appeals of the District of Columbia,[20] and have been assigned docket numbers 78–1993 and 78–1994.

To complete the *dramatis personae* of the immediate controversy, the National Resources Defense Council, Inc. (NRDC) and the States of New York, Texas and Wisconsin have intervened in support of the NRC's decision, while a group of twenty electric utility companies led by Baltimore Electric and Gas Company have filed an amicus curiae brief urging that the order of the NRC be vacated and remanded for further consideration.

## II. CHOICE OF FORUM

■ NRDC has moved to dismiss for want of jurisdiction those petitions that seek review of the December 23 Order, primarily on the ground that that order is not a reviewable "final order."[21] At oral argu

such as deferring further consideration of GESMO and the related proceedings pending completion of ongoing national and international studies; or (4) continuing GESMO to some convenient stopping point, such as completion of the health, safety, and environmental hearings.

17. *See* 42 Fed.Reg. 65334 (1977).

18. *See* 43 Fed.Reg. 20575 (1978).

19. *See* 28 U.S.C. § 2344 (1976).

20. *See* note 33 and accompanying text *infra*.

21. Our jurisdiction under 28 U.S.C. § 2342 and 42 U.S.C. § 2239 "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the NRC's termination of the GESMO and related licensing proceedings is limited to "final orders" of the Commission. NRDC con

tends that the December 23 Order is not a "final order" within the meaning of 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342(4) because the administrative process was not consummated until the reasons for the NRC's proposed action were published, in the May 8 Memorandum. In addition, NRDC argues (1) that there was no "entry" of a final order within the meaning of 28 U.S.C. § 2344 until May 8, 1978, when the NRC issued its Memorandum of Decision, and (2) that the December 23 pronouncement was not an "order" within the meaning of 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342 inasmuch as it omitted a statement of reasons, as required by the Administrative Procedure Act (APA), *see* 5 U.S.C. §§ 553(c) and 557(c), and the NRC regulations, *see* 10 C.F.R. §§ 2.760(1), 2.770, 2.806. This argument is predicated on the erroneous premise that the provisions governing review of administrative orders adopt the same defini

ment it was conceded that granting NRDC's motion would not affect the entitlement of any party to secure judicial review of the NRC's decision to terminate the GESMO and related licensing proceedings. This is so because every party that sought review of the December 23 Order also filed a timely petition from the May 8 Memorandum, either in this Court or in the Court of Appeals for the District of Columbia, and if it were determined that the December 23 Order is not "final," the May 8 Memorandum would perforce constitute such a "final order." Consequently, no matter which pronouncement is the "final order," this Court has jurisdiction to review the NRC's action.[22]

Apparently, then, what NRDC hopes to achieve by its motions is to have this controversy transferred to the Court of Appeals for the District of Columbia pursuant to 28 U.S.C. § 2112(a). That section specifies which court is the proper forum for review of an administrative decision when petitions are filed in more than one court of appeals. It states in pertinent part:

> If proceedings have been instituted in two or more courts of appeals with respect to the same order the agency . . shall file the record in that one of such courts in which a proceeding with respect to such order was first instituted. The other courts in which such proceedings are pending shall thereupon transfer them to the court of appeals in which the record has been filed. For the convenience of the parties in the interest of justice such court may thereafter trans-

fer all the proceedings with respect to such order to any other court of appeals.

Presumably, NRDC believes that if it is concluded that the December 23 Order is not the NRC's "final order" and that therefore we are not the court "in which a proceeding with respect to such order was first instituted," we must necessarily transfer all the petitions to the District of Columbia Circuit, which would then decide whether to adjudicate the controversy or perhaps transfer it again to another forum.

Section 2112(a), however, is not jurisdictional in nature, but rather, is a somewhat unusual venue statute.[23] It directs that when petitions from "the same order" are filed in different circuits, thereby vesting each of them with jurisdiction, the choice of the appropriate forum for review of that order is to be made by the court in which a petition was filed first. Although it is presumed that that court will retain jurisdiction,[24] it remains free to transfer the controversy elsewhere, "[f]or the convenience of the parties in the interest of justice." The purpose of § 2112(a) is "to provide a mechanical rule easy of application to avoid confusion and duplication by the courts."[25] By eliminating the earlier practice whereby the agency selected the forum from among the courts in which petitions had been filed, and by requiring the transfer of all petitions to one court,

> "[t]his provision contemplates judicial review of particular agency action by the same court. The parties are spared simultaneous participation in proceedings

---

tion of the term, "order," as is found in the APA, as well as the requirement that an explanation accompany the order. *See Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. 1064, 1079 (C.D.Cal.1976).

**22.** Moreover, in this Court, a "premature appeal taken from an order which is *not final* but which is followed by an order that *is final* may be regarded as an appeal from the final order in the absence of a showing of prejudice to the other party." *Richerson v. Jones*, 551 F.2d 918, 922 (3d Cir. 1977) (emphasis in original).

**23.** *See American Public Gas Ass'n v. FPC*, 180 U.S.App.D.C. 380, 555 F.2d 852 (1976); *NLRB v. Bayside Enterprises, Inc.*, 514 F.2d 475 (1st

Cir. 1975); *Eastern Air Lines, Inc. v. CAB*, 122 U.S.App.D.C. 375, 354 F.2d 507 (1965). *See generally* 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3944 (1977) (hereinafter Wright & Miller).

**24.** *See Public Service Commission for the State of New York v. FPC*, 153 U.S.App.D.C. 195, 472 F.2d 1270 (1972); Wright & Miller, *supra* note 23, at 339.

**25.** *NLRB v. Bayside Enterprises, Inc., supra*, 514 F.2d at 476.

in more than one circuit, and forum shopping is discouraged.[26]

Although this salutary provision does not by its terms provide a solution for every conceivable situation in which review of the same administrative action is sought in more than one circuit, courts have freely relied on its underlying principles to fashion appropriate approaches to related problems and "[t]o prevent unseemly conflicts that could result should sister circuits each take the initiative and issue conflicting decisions" as to where venue lies.[27] Essentially,

> [o]ur main concern in handling cases such as this, is that one of the circuits involved take the initiative and decide the threshold question of proper forum rather than delay consideration of the merits due to an overabundance of procedural caution.[28]

Accordingly, courts have held that even when the validity of the filing of the first petition is in dispute, all the petitions should be transferred to the court in which the disputed petition was filed, and that court should proceed to determine the order in which valid petitions for review were filed.[29] Furthermore, when the race to the courthouse results in a virtual "dead heat," various circuits have adopted the practice of consulting with one another and deferring to one court among them to ascertain, after weighing the interest of justice, which tribunal should be the forum for the decision on the merits.[30] The District of Columbia Circuit, which has taken the lead in resolving these procedural problems, has explained its practical approach in the context of a situation where there were virtually simultaneous filings:

In view of the lack of first-filing in any one circuit, Section 2112(a) cannot be implemented through the mechanics set forth in its first sentence quoted above. Instead, we look to the ultimate provision of § 2112(a), which authorizes transfer of the proceedings to another circuit "[f]or the convenience of the parties in the interest of justice." Judicial review in the forum determined by that standard is a stated congressional goal, and our obligation is to honor the legislative will as expressed in the statute as a whole.[31]

Also in keeping with the purposes of the statute, courts have interpreted the term, "the same order," so as to insure the consolidation in one court of petitions from sequential orders arising from the same administrative background and cumulative record.[32]

In the present case, the Court of Appeals for the District of Columbia transferred Allied-General's petitions to this Court notwithstanding the fact that it was not clear whether this Court is the one "in which a proceeding with respect to such order was first instituted." In granting the NRC's motion that the petitions be transferred, the District of Columbia Court reasoned in a per curiam opinion that,

> [s]ince the petitions for review filed in the Third Circuit were filed first, considering the time of filing alone, it seems to us that the (sic) court should decide whether the action of the Commission of December 23 or that of May 8 was its final order in these proceedings. See *Abourezk v. FPC*, 168 U.S.App.D.C. 246, 513 F.2d 504 (1975).[33]

---

**26.** *American Civil Liberties Union v. FCC*, 158 U.S.App.D.C. 344, 346, 486 F.2d 411, 413 (1973). *See* Wright & Miller, *supra* note 23, at 332.

**27.** *See Abourezk v. FPC*, 168 U.S.App.D.C. 246, 247, 513 F.2d 504, 505 (1975) (statement of Bazelon, C. J., on denial of petition for rehearing en banc).

**28.** *Id.*

**29.** *See, e. g., id.*

**30.** *See, e. g., United Steelworkers of America v. Marshall*, 592 F.2d 693 (3d Cir. 1979); *American Public Gas Ass'n, supra*.

**31.** *American Public Gas Ass'n, supra*, 180 U.S. App.D.C. at 385, 555 F.2d at 857.

**32.** *See, e. g., BASF Wyandotte Corp. v. Costle*, 582 F.2d 108 (1st Cir. 1978). *See also* Wright & Miller, *supra* note 23, at 332–34.

**33.** *Allied-General Nuclear Services v. NRC*, Nos. 78–1144 & 78–1422, typed opinion at 3 (D.C.Cir. July 26, 1978) (per curiam).

The District of Columbia Court thus did not base its transfer on the express terms of § 2112(a), but on a judicially-created practice, tailored to meet the statute's goal of fixing a mechanical rule for determining which court should apply the "interest of justice" standard to choose the forum in which judicial review will take place. Regardless of which court technically had priority under § 2112(a) to choose the appropriate forum for disposition on the merits, our sister court in the District of Columbia graciously ceded to us any right it may have to select that forum so that the possibility of an "unseemly conflict" not arise as to which of the NRC's actions was its "final order." Under different circumstances we probably would reach that threshold issue of finality since it is generally expected that the parties will have a fair race to the courthouse.[34] In this case, however, we deem it appropriate to retain jurisdiction over these petitions without ultimately deciding which action of the NRC constituted its "final order."[35] We arrive at this con-

clusion on the basis of our application to the present controversy of the policies that are to be considered in choosing a forum when multiple petitions are filed for review of agency rulings.

It would do little to further the purposes of § 2112(a) were we now to decide that the May 8 Memorandum was the NRC's "final order" and therefore transfer all the petitions to the District of Columbia Circuit in order that it may choose a forum. Only if Allied-General, which was the first to file a petition after the May 8 Memorandum (and which filed it in the District of Columbia Court), insisted that the winner of the race to the courthouse be ascertained would it possibly be in the interest of justice to determine the finality question. But in the District of Columbia Circuit, Allied-General did not oppose the NRC's motion to transfer, and subsequently it expressed its willingness to have this Court adjudicate the validity of the NRC's action. Allied-General is primarily interested in having the matter resolved expeditiously,[36] which certainly

---

**34.** *See Abourezk, supra,* 168 U.S.App.D.C. at 247, 513 F.2d at 505.

**35.** We note, however, that it is at least fairly plausible to conclude that the December 23 Order was the NRC's "final order," because that pronouncement contains essential attributes of finality. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970) (judicial review possible when it "will not disrupt the orderly process of adjudication"); *Chicago & Southern Air Lines v. Waterman Steamship Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948) (administrative orders are reviewable when "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process"); *Isbrandtsen Co. v. United States,* 93 U.S.App.D.C. 293, 297, 211 F.2d 51, 55, *cert. denied,* 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954) ("a final order need not necessarily be the very last order in an agency proceeding," so long as it meets the conditions of finality); *Wright & Miller, supra* note 23, at 315–16. *Cf. Baltimore & Ohio R. Co. v. United States,* 201 F.2d 795 (3d Cir. 1953) (this Court entertained petition for review, but vacated and remanded order to agency so that it may develop a record capable of review). Indeed, in contrast to the December 23 decision, the May 8 Memorandum had no practical consequence. On the other hand, there is something to be said in favor of the

position that when the agency promises to provide in a short time a statement of reasons, its order is not "final" until the statement is published, particularly since the practice of separating the order and its underlying reasons has received judicial sanction, *see Baltimore & Ohio Chicago Terminal Railroad Co. v. United States,* 583 F.2d 678, 688 (3d Cir. 1978). That way, parties will not feel compelled to file unnecessary "protective" orders out of uncertainty, *see Outland v. CAB,* 109 U.S.App.D.C. 90, 93–94, 284 F.2d 224, 227–28 (1960), and those parties that delayed in filing petitions for review in reliance upon the agency's promise to issue a statement of reasons in due course will not be penalized for so relying.

**36.** This is demonstrated by Allied-General's Response to NRDC's motion to dismiss its petition for review of the December 23 Order, filed in docket number 78–1993 in the District of Columbia Court. There, Allied-General stated, on pages 2–3:

> From our standpoint the jurisdictional issue is not a point of consequence; we filed the two successive Petitions for Review precisely to avoid the jurisdictional question which the Commission's method of proceeding had given rise to. We hope the jurisdictional matter is decided promptly by this Court, along with the Commission's Motion to Transfer, so that all parties soon will know in what circuit the

would not occur were we now to transfer the petitions back to the District of Columbia. This is so because a motions panel of this Court had at an earlier date referred NRDC's motion to dismiss to a merits panel, and the consolidated cases have already been briefed and argued on the merits.

At oral argument, even counsel for NRDC conceded that the more practical, efficient, and just alternative would be for us to reach the merits. Nonetheless, NRDC did not withdraw its motion because it regarded the matter to be a jurisdictional defect that this Court could remedy only if it transferred the cases to the District of Columbia Circuit, which would then presumably retransfer the cases to us for disposition on the merits. We have already concluded that NRDC's motion does not raise a jurisdictional deficiency because petitions for review from both the December 23 Order and the May 8 Memorandum were timely filed in this Court. There thus being no reason to go through the process of transferring petitions back and forth between two circuits, while the parties as well as the public anxiously await resolution of this important controversy, NRDC's motion will be denied, and we shall proceed to address the merits.

## III. CHALLENGES BASED ON THE ATOMIC ENERGY ACT

### A. The Reasons for the NRC Decision

As explained by the NRC in considerable detail in its May 8 Memorandum of Decision, the December 23 Order terminating GESMO and related licensing proceedings was prompted by the President's policy initiatives as well as by the pendency of studies into alternative fuel cycles. With respect to the first reason for termination, the NRC noted in its Memorandum that although the proceedings in question concern domestic activities, it is appropriate for the NRC to weigh the foreign policy implications as well, because the AEA requires that the common defense and security be considered in making any domestic licensing decision.[37] "[I]n the absence of a clear statutory mandate to the contrary" and in view of Congress' reception of the Administration's nuclear policy,[38] the NRC deemed it proper to accord "substantial deference" to the President's request that it terminate the proceedings, since "the President is the national spokesman in the area of foreign policy."[39] In addition, the NRC examined the President's request and reasoned that indeed the country's international prerogatives would be compromised were the proceedings to continue.[40]

judicial review is to be had. We also hope that the jurisdictional issue will not give rise to conflicting decisions in different circuits that might introduce further complications unrelated to the merits.

37. 43 Fed.Reg. at 20576–78. As examples of provisions referring to the common defense and security as an element to be considered in domestic licensing decisions, the memorandum cited §§ 53(b), 57(c)(2), 103(b)(3), (d), 104(d), 161(b), (i)(2) and 182(a) of the AEA.

38. Congress explicitly supported the alternative fuel cycle studies proposed by the President in § 105 of the Nuclear Non-Proliferation Act of 1978, Pub.L.No.95–242, 92 Stat. 120, which was pending in the Senate at the time of the December 23 decision (having already passed the House of Representatives) and was enacted before the May 8 Memorandum was released. Section 105 states:

The President shall take immediate initiatives to invite all nuclear supplier and recipient nations to reevaluate all aspects of the nuclear fuel cycle, with emphasis on alternatives

to an economy based on the separation of pure plutonium or the presence of high enriched uranium, methods to deal with spent fuel storage, and methods to improve the safeguards for existing nuclear technology.

. . . .

22 U.S.C. § 3224 (Supp.1979). In addition, Congress endorsed the non-proliferation goals of the Administration, as well as its efforts to encourage international cooperation, in §§ 2 and 3 of that Act, 22 U.S.C. §§ 3201–02. See 43 Fed.Reg. at 20577–78, where the Memorandum also acknowledges that individual members of Congress have expressed opposition to the President's April 7 policy statement.

39. See 43 Fed.Reg. at 20577.

40. The NRC recognized that the United States' initiatives to discourage other nations from reprocessing spent fuel would be undermined if at the same time it continued to pursue domestic commercial reprocessing, since American arguments that the marginal economic benefits are outweighed by the grave security dangers would lose their credibility. See id.

The second reason given for termination at this time is the pendency of two alternative fuel cycle studies—INFCE, which is expected to take at least two years, and an interagency Non-Proliferation Alternative System Assessment Program (NASAP) under the coordination of the Department of Energy, which is being undertaken to develop a technical basis for the United States' contributions to INFCE. The NRC concluded that because the results of these studies are anticipated in the near term, and because the NRC must consider the information and alternatives developed therein before reaching a decision on the pending applications or on GESMO, it would be a waste of effort to continue the pending proceedings and then to supplement or completely revise the record to reflect those results.[41]

The NRC carefully examined policy-based arguments tendered by various commentors that the proceedings ought to be continued, but was not persuaded by them.[42] It emphasized that its decision to terminate the GESMO and related licensing proceedings "does not involve their final disposition on the merits," and is taken because "the present state of studies and national fuel cycle policy evaluations precludes an in-formed decision on the merits of plutonium recycle at this time."[43] Finally, the NRC noted that the President and Congress have indicated that they may reassess their positions after the studies are completed, and that the NRC is committed to reexamine its December 23 decision "in light of the completed studies, expected to take about two years, and any revisions of the Administration's policies."[44]

■ Essentially, then, the NRC has imposed a moratorium, expected to last about two years, upon its decisionmaking process regarding plutonium recycling, and, as a result, has terminated the pending GESMO and related licensing proceedings. In the agency's view, it had "the discretion to stop processing applications and to refuse to accept new ones when there are sound regulatory reasons to do so."[45] We shall assess the validity of the NRC's assertion by examining first, whether the imposition of a moratorium contravenes the legislative scheme, and second, whether the NRC abused its discretion, abridged procedural requirements, or acted arbitrarily, capriciously, or otherwise not in accordance with the law when it issued the December 23 Order.[46]

41.  43 Fed.Reg. at 20578.

42.  *See* 43 Fed.Reg. at 20579. The NRC dismissed the argument that the proceedings ought to be continued in order that a much-needed energy source may timely be developed. It did so on the grounds that the overriding risk of proliferation justifies some delay, that a two-year delay to deal with this risk outweighs the economic costs entailed, and that in any event significant progress probably could not be made in the proceedings while the other studies were still underway. As to the contention that the resources already invested in the proceedings would be wasted if they were terminated, the NRC responded that if the proceedings were ultimately resumed, appropriate portions of the record could be reintroduced, and that it would be even less productive to continue the proceedings and then to be required to revise the record in a substantial fashion. Finally, the NRC rejected suggestions that the GESMO proceedings be continued to develop information for purposes of comparison to other fuel cycles on the ground that it is not within its province to perform general energy studies. In addition to treating these policy-based arguments, the NRC Memorandum also dealt with contentions that it is legally required to continue the proceedings.

43.  *See* 43 Fed.Reg. at 20578–79.

44.  *See id.* The Memorandum continued: "At the present time it is not possible to determine whether our proceedings will then be reinstituted or whether some other course will be adopted."

45.  43 Fed.Reg. at 20579.

46.  The scope of our review, which is delimited in 5 U.S.C. § 706(2) (1976), is narrow. We may overturn the NRC's decision if it violates any constitutional or statutory provisions, but may not otherwise substitute our judgment for that of the agency or set aside its decision unless it is unreasonable. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

B. *The NRC's Authority to Place a Moratorium Upon a Decisionmaking Process Conducted Pursuant to the AEA and thereby to Terminate Rulemaking and Licensing Proceedings*

In passing the Atomic Energy Act of 1954, Congress enacted "a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." [47] This legislation declares it to be the policy of the United States that the development, use, and control of atomic energy be conducted in such a way as "to promote world peace" and "to make the maximum contribution to the general welfare, subject at all times to the paramount objective of making the maximum contribution to the common defense and security." [48] The AEA is designed to effectuate this policy by providing for a wide range of programs. Among the programs specified in § 3, and particularly relevant to the present case, are:

(c) a program for Government control of the possession, use, and production of atomic energy and special nuclear material, whether owned by the Government or others, so directed as to . . . provide continued assurance of the Government's ability to enter into and enforce agreements with nations or groups of nations for the control of special nuclear materials and atomic weapons; . . . [and]

(e) a program of international cooperation to promote the common defense and security . . . .[49]

To further these statutory objectives, § 161(p) of the AEA [50] confers upon the NRC an unfettered mandate to issue "such rules and regulations as may be necessary to carry out the purposes of this Act." With slightly greater specificity, and relevant for the GESMO rulemaking proceeding, § 161(b) authorizes the Commission to

establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property . . . .[51]

A third provision, § 103,[52] directs that commercial licenses, such as those for which applications have been made in the present case, shall be issued "subject to such conditions as the Commission may by rule or regulation establish to effectuate the purposes and provisions of this chapter." Section 103 admonishes, however, that "no license may be issued . . . if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public."

Given this broad delegation of authority to the NRC to choose the necessary means by which to implement the general policy objectives of the AEA, we cannot say that the NRC must inexorably proceed with the processing of license applications and the development of a final GESMO when in its judgment to do so would endanger the attainment of its statutory objectives. Indeed, it would appear to be fully congruent with the broad delegation of authority in the AEA, which allows the NRC to determine the conditions, rules and regulations pursuant to which licenses shall be issued as well as the scope and format of licensing

47. *Siegel v. AEC,* 130 U.S.App.D.C. 307, 312, 400 F.2d 778, 783 (1968). *See also Public Service Co. of New Hampshire v. NRC,* 582 F.2d 77, 82 (1st Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978); *North Anna Environmental Coalition v. NRC,* 174 U.S.App.D.C. 428, 431 432, 533 F.2d 655, 658-59 (1976).

48. Section 1 of the AEA, 42 U.S.C. § 2011 (1976).

49. 42 U.S.C. § 2013 (1976).

50. 42 U.S.C. § 2201(p) (1976).

51. 42 U.S.C. § 2201(b) (1976).

52. 42 U.S.C. § 2133 (1976).

proceedings, to construe that statute's provisions as granting the NRC the authority to refuse to conduct a licensing proceeding for a reasonable period of time in furtherance of its statutorily delineated responsibilities.

Our conclusion that an agency that is invested with such extensive powers to effectuate its far-reaching mandate may impose a moratorium upon its decisionmaking process when sound regulatory reasons exist for doing so is, we believe, consonant with the Supreme Court's approach in *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). There, the question was whether the Federal Power Commission (FPC) had authority to impose a two and one-half year moratorium upon filings of rate schedules while it implemented a new regional ratemaking scheme. The Court noted that it "has repeatedly held that the width of administrative authority must be measured in part by the purposes for which it was conferred . . . ."[53] Citing § 16 of the Natural Gas Act,[54] which is similar in breadth to § 161(p) of the AEA, the Court continued, "[s]urely the Commission's broad responsibilities therefore demand a generous construction of its statutory authority."[55] After rejecting arguments for a narrow construction of the FPC's authority that were based on a number of statutory provisions, the Court concluded that a moratorium may be imposed. It stated that, "[w]e are, in the absence of compelling evidence that such was Congress' intention, unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes."[56]

■ Nothing brought to our attention by petitioners regarding the AEA or its history has convinced us that the NRC has less discretion to impose a moratorium in appropriate circumstances than does the FPC, or that the NRC has failed to comply with any procedural requirements in deferring consideration of wide-scale plutonium recycling. We agree with petitioners that under § 103, once an applicant complies with the provisions of the AEA and Commission rules and regulations, the NRC must issue a license unless it determines that "the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public."[57] But we do not believe that a finding of inimicality or noncompliance with the applicable requirements has to be made before the NRC may suspend license application proceedings. This would appear to be particularly true where a moratorium is declared to enable the Commission to make a reasoned decision regarding the rules and regulations that should be applied and whether the issuance of licenses would be inimical to the common defense and security.

■ Nor are we persuaded by petitioners' contention that in suspending the license application proceedings the NRC violated § 189(a) of the AEA,[58] which requires that a public hearing be afforded in any license proceeding "upon the request of any person whose interest may be affected by the proceeding." As we understand it, that provision is similar to one governing FCC licensing procedures.[59] It guarantees a hearing

53. 390 U.S. at 776, 88 S.Ct. at 1364.

54. 15 U.S.C. § 717o (1976), which provides that the Commission "shall have power to perform any and all acts, and to prescribe . . . such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this" Act.

55. 390 U.S. at 776, 88 S.Ct. at 1365.

56. *Id.* at 780, 88 S.Ct. at 1367.

57. Indeed, as petitioners point out, this reading of § 103 is supported by the section's legislative history. The Joint Committee on Atomic Ener-

gy made it clear that with respect to license applications under § 103, the "Commission is required to issue licenses to all qualified applicants without other discretion on its part." S.Rep.No.1699, 83d Cong. 2d Sess. 19 (1954), U.S.Code Cong. & Admin.News 1954, pp. 3456, 3475.

58. 42 U.S.C. § 2239(a) (1976).

59. Section 309 of the Communications Act of 1934, 47 U.S.C. § 309 (1976), which requires that the FCC either summarily grant a license application by finding it to be in the public interest, or conduct a hearing. Despite the

to all interested parties sometime before the NRC decides whether to grant or deny a license application, it does not mandate that the proceedings in which the ultimate disposition of such an application is being considered continue without any interruption or that a hearing be held before the NRC orders that a moratorium be placed upon its decisionmaking process.

## C. The NRC's Exercise of its Discretion to Impose a Moratorium Upon its Decisionmaking Process and to Terminate GESMO and Related Licensing Proceedings

Inasmuch as we conclude that the NRC may, in its discretion, delay processing applications and refuse to accept new ones when there are sound reasons for doing so, we must now examine whether in the present case this discretion was abused or was exercised in a manner not in conformity with statutory dictates. Petitioners raise four grounds upon which the NRC's decision may be faulted.

[7] First, petitioners suggest that under the due process clause they should have been afforded an adjudicatory-type hearing

before the NRC issued the December 23 Order. However, cases upholding the imposition of temporary "freezes" upon the processing of license applications by the FCC [60] indicate that applicants need not be afforded such a hearing before an agency suspends the processing of license applications. Here, the NRC twice gave notice and solicited comments from all affected parties prior to releasing its December 23 Order. In the absence of any other statutory or regulatory prescriptions, it is not for the courts to impose additional procedural requirements on the agency.[61]

■ Next, petitioners assert that in fact the NRC did not place a moratorium upon its decisionmaking process regarding plutonium recycling but really terminated it forever and thus effectively denied the license applications, subject only to the possibility of future reconsideration. In support of this interpretation of the NRC decision, petitioners point out that despite Commissioner Kennedy's objections,[62] the NRC decided to "terminate," rather than to "defer" the GESMO and related licensing proceedings. The NRC, it is further noted, did not guar-

---

language of the statute, courts have uniformly construed it to permit the FCC to impose a temporary, general "freeze" on the filing and processing of applications when such a freeze is properly determined by the FCC to be in the public interest. The courts have reasoned that in such circumstances, "the right to a hearing under the terms of section 309(e) of the Communications Act has not materialized. . . . There is nothing to warrant a conclusion that hearings called for by section 309 will not be granted when the freeze is lifted, with respect to applications then filed." *Kessler v. FCC*, 117 U.S.App.D.C. 130, 141, 326 F.2d 673, 684 (1963). *See also Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948 (6 Cir. 1971); *Wentronics, Inc. v. FCC*, 118 U.S.App.D.C. 36, 331 F.2d 782 (1964); *Harvey Radio Laboratories, Inc. v. United States*, 110 U.S.App.D.C. 81, 289 F.2d 458 (1961); *Mesa Microwave, Inc. v. FCC*, 105 U.S.App.D.C. 1, 262 F.2d 723 (1958).

60. *See* note 59 *supra*.

61. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

62. Commissioner Kennedy concurred in the December 23 Order, but preferred the use of

the term "defer" for "terminate" to describe the NRC's action. In a concurring statement to the May 8 Memorandum he explained his position:

> Deferral of these proceedings would have avoided the unfortunate appearance that the Commission has made a final decision not to act upon license applications which are properly before it. Additionally, deferral would have left the Commission less susceptible to the argument that the Commission is improperly deferring to a Presidential request affecting not only a rulemaking hearing but also specific licenses which are being treated in an adjudicatory context.

43 Fed.Reg. at 20582. Although the majority of the NRC did not specify its reasons for "terminating" rather than "deferring" the pending proceedings, it may be assumed that the majority was swayed by comments from the Executive Branch and the interested parties arguing that anything less than complete termination may lead foreign countries to question the sincerity of United States overtures to deter commercial reprocessing. *See, e. g.*, app. at 76a (PIRG), 110a (NRDC), 172a (New York), 178a (Eizenstat letter).

antee that it would reopen the proceedings in two years, and has conceded in its Memorandum that "it is not possible to determine whether our proceedings will then be reinstituted or whether some other course will be adopted." [63]

This contention fails to distinguish between the GESMO and related licensing proceedings, on the one hand, and the ultimate issues of whether to grant the licenses and whether to commit the United States to plutonium recycling programs on the other hand. The December 23 decision terminated the GESMO and related licensing proceedings because in the judgment of the NRC the ultimate issues could not be resolved on their merits within the next two years. At the same time, the NRC committed itself to reexamine this decision in light of future developments, and to determine at a later date what course of action should then be taken on the license applications and the overall question of wide-spread plutonium recycling. Presumably, whatever course the NRC does adopt in the future will lead to a final determination whether or not to issue the requested licenses. In view of the flexibility that the NRC has in fixing the scope and format of its proceedings, as well as the real possibility that the GESMO and licensing proceedings as originally scheduled will be an inappropriate vehicle for arriving at a decision on the ultimate issues, we cannot say that the NRC abused its discretion in "terminating" rather than "deferring" the present proceedings and in refusing to bind itself to a future plan. Furthermore, as we understand it, such a decision may properly be regarded as a statutorily permitted moratorium on the decisionmaking process regarding the ulti-

mate issues, which are still before the agency. Finally, under the circumstances, the expected two-year duration of this moratorium cannot be deemed unreasonable.

Of course, the NRC may not completely terminate license application proceedings without passing on the merits of the applications, simply by declaring an open-ended moratorium. It is required by statute to fix the conditions and regulations pursuant to which licenses will be granted, and to award such licenses if the prerequisites are met, unless it makes a finding of inimicality to the common defense and security or to the public health and safety.[64] But we are satisfied, at least for now, that the NRC has not abused its discretion in refusing to continue the pending proceedings on the ground that it cannot yet formulate a generic standard or make a determination on the question of inimicality. When and if it ever becomes apparent that the NRC has de facto denied the license applications despite the applicants' compliance with the pertinent regulations and without making a finding of inimicality, or that the moratorium is of unreasonable duration, judicial recourse will be available to the aggrieved parties.

Petitioners also maintain that the NRC impermissibly terminated the GESMO and related licensing proceedings at the request of the President and in deference to his foreign policy pronouncement. They charge that in failing to act independently of the Executive Branch, the NRC contravened Congress' express intent that the Commission be completely free from presidential influence and control.[65] According

63. 43 Fed.Reg. at 20579.

64. *See* § 103 of the AEA, 42 U.S.C. § 2133 (1976).

65. Expressions of congressional intent that the Commission be independent of the Executive Branch may be found throughout the debates surrounding the passage of the AEA, which took place against the backdrop of the Dixon-Yates controversy. That controversy arose when the President attempted to instruct the Commission to enter into a contract with particular utilities for the provision of electricity to

certain Commission facilities. On legislative sentiment, *see, e. g.* 100 Cong.Rec. 9743 (1954) (remarks of Senator Hill); *id.* at 10297–98 (colloquy of Congressmen Murray and Holifield); *id.* at 11532 (remarks of Senator Magnuson); *id.* at 11536 (remarks of Senator Gore). Aside from resting on the legislative history of the AEA, petitioners insist that Congress made its intent evident in the provisions of the AEA by narrowing the circumstances under which the AEA may decline to grant a license. This argument, which focuses on § 103, is treated in

to petitioners, the fact that the President has primary responsibility over foreign affairs does not justify the NRC's derogation from Congress' plan, since foreign affairs powers are vested in Congress as well. And, petitioners assert, Congress exercised its share of those powers by legislating that with respect to nuclear energy, which inevitably touches upon the sensitive area of foreign affairs, a strict separation is to prevail between the President and the Commission. This is particularly so, petitioners declare, in the context of domestic licensing. In contrast, in the area of international arrangements, such as export licensing, Congress has legislated a divergence from this scheme by making Commission decisions subject to approval by the President.[66]

Although petitioners' argument is resonant with constitutional subtleties concerning the "twilight zone"[67] in which congressional and presidential powers overlap, neither the authority reposed in the NRC nor the agency's exercise of that authority in this case require us to venture into that largely unchartered area. The legislative history produced by petitioners makes clear that Congress intended that the Commission be independent not only from pressures brought to bear by the President, but from all external pressures. Representative is the view expressed by Senator Magnuson:

Actually, the AEC was established by Congress with the hope and aim of making it the most sensitive agency of

Government, more independent than any other, and to be protected from Congress itself, and from all other interference, including Executive interference.[68]

Independence, however, does not mean that the Commission must ignore or reject positions espoused by the President, by Congress or by other parties. The Commission was "charged with a most sensitive and most vital responsibility,"[69] a responsibility that cannot possibly be performed properly if the Commission is oblivious or nonresponsive to actions being taken by others, whether within or outside the government. When it created independent administrative agencies, Congress undoubtedly desired that they interact with the three branches of the government much as the legislative body interacts with the executive branch, with "separateness but interdependence, autonomy but reciprocity," so that "practice will integrate the dispersed powers into a workable government."[70]

As previously set forth, the NRC is directed in many provisions of the AEA to consider "the common defense and security." Any contemplation of these sensitive matters necessarily touches upon areas that are also within the domain of the President and of Congress.[71] It was therefore appropriate for the NRC to take note of the relevant developments in the executive and legislative branches and to ascertain, with the help of interested parties, what bearing these developments may have on its own

section III. B. *supra.* Petitioners also rely on two cases involving presidential removal of commissioners of independent agencies, *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). These cases are factually distinguishable, and, moreover, their approach has been questioned in the light of more recent Supreme Court decisions. *See* Bruff, *Presidential Power and Administrative Rulemaking,* 88 Yale L.J. 451, 475–85 (1979).

**66.** *See, e. g.* 42 U.S.C.A. §§ 2077(b), 2153(b), & 2155 (1976 & 1979 Pocket Part).

**67.** *See Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure Case),* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

**68.** 100 Cong.Rec. 11532 (1954).

**69.** 100 Cong.Rec. 9743 (1954) (Senator Hill).

**70.** *Youngstown, supra,* 343 U.S. at 635, 72 S.Ct. at 870.

**71.** *See, e. g., Youngstown, supra; Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *United States v. American Telephone & Telegraph Co.,* 185 U.S.App.D.C. 254, 260–261, 567 F.2d 121, 127–28 (1977). *See generally,* L. Henkin, Foreign Affairs and the Constitution (1972); Comment, *United States v. AT & T: Judicially Supervised Negotiation and Political Questions.* 77 Colum.L.Rev. 466, 473–76 (1977).

agenda. As we understand the NRC's actions here, that is all it did, and it maintained its independence from both those branches while making an informed decision to suspend its proceedings.

There is no evidence that the President improperly interfered with the NRC's decisionmaking process, or that the NRC capitulated to the President. Instead, the agency appears to have examined the President's position, and agreed with the President's contention that continuation of the proceedings would adversely affect the President's nonproliferation efforts. Then, after determining that Congress had not exercised its constitutional powers in this area in a contrary manner, neither through the AEA nor through subsequent legislation, the NRC decided that it would be prudent to terminate the proceedings for a time so that the President might pursue his objectives. Given this record, we cannot say that the NRC abused its discretion or acted arbitrarily, capriciously, or not in accordance with the law when it rested its decision in part on a desire not to obstruct the goal of securing international nonproliferation.

■ As a final ground for attacking the NRC's exercise of its discretion in the present case, petitioners contend that the NRC impermissibly relied upon the INFCE and NASAP studies in deciding to terminate GESMO and the related licensing proceedings. This is so, they argue, because assertions about these studies are made in the Memorandum without support in the record, in violation of 5 U.S.C. § 556(e),[72] and also because the studies are not being undertaken by the NRC and are beyond its control. Petitioners would have us confine an agency's discretion to prescribe a moratorium upon its decisionmaking process while the results of relevant studies are awaited, to those situations where the agency itself is conducting the investigation, as occurred in the *Permian Basin Rate Cases* and the FCC "freeze" cases. But to place such a limitation upon the NRC's discretion to impose a moratorium would appear to serve no regulatory purpose. If the NRC may freeze pending proceedings when in its judgment it cannot make a reasoned decision until the results of ongoing studies are completed and available for evaluation, it should make no difference whether the studies are being prepared by the NRC or by other parties. As for the particular studies involved, they were identified and mentioned throughout the proceedings leading up to the December 23 Order, and the NRC did not violate 5 U.S.C. § 556(e) in relying on them as a partial basis for its decision.

## IV. CHALLENGES BASED ON THE NATIONAL ENVIRONMENTAL POLICY ACT

■ Aside from attacking the NRC's decision of December 23 on the ground that it violated the AEA, petitioners charge that the NRC was required under § 102(2)(C) of NEPA [73] to prepare an environmental impact statement (EIS) before deciding not to proceed with wide-scale plutonium recycle and to terminate the GESMO and related licensing proceedings, since that decision constituted a major federal action significantly affecting the quality of the human environment. For an appreciation of the scope of § 102(2)(C), petitioners refer us to *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973), where the court stated:

> The statutory phrase "actions significantly affecting the quality of the environment" is intentionally broad, reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality

---

72. Section 556(e) provides:

The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

73. 42 U.S.C. § 4332(2)(C) (1976).

of the environment a concern of every federal agency. The legislative history of the Act indicates that the term "actions" refers not only to construction of particular facilities, but includes "project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs . . . ."[74]

Petitioners also cite *National Helium Corp. v. Morton*, 455 F.2d 650 (10 Cir. 1971), for the proposition that it makes no difference for purposes of NEPA whether the decision is to terminate rather than to institute a program. And, petitioners point out, it is well settled that a *post hoc* rationalization will not satisfy NEPA's procedural mandate.[75]

Turning to the December 23 Order, petitioners insist that inasmuch as any decision whether or not to authorize wide-scale plutonium recycle goes to the heart of the substantive policy of § 101(b)(6) of NEPA[76] (namely, that the recycling of depletable resources be maximized), compliance with the procedural requirement that the NRC prepare an EIS is particularly important.[77] Petitioners point out that the NRC itself has on many occasions recognized the need to compose an EIS on this subject, and that it undertook to prepare GESMO to fulfill that statutory obligation.[78] Inasmuch as any decision on either the wide-scale deployment of plutonium recycling facilities or any of the individual licensing applications would significantly affect the environment, petitioners contend, the NRC was required to complete GESMO prior to any decision not to authorize plutonium recycling. Further, petitioners assert that the December 23 Order was a decision not to authorize wide-scale plutonium recycling

because it brought to a halt all progress toward the implementation of this new technology after significant prior federal involvement, and denied the applicants any means of pursuing their license applications.

It is already apparent from our analysis of petitioners' challenges under the AEA that we view the December 23 Order suspending the decisionmaking process and terminating GESMO and related licensing proceedings in a different light. Contrary to petitioners' contentions, we have already concluded that the NRC has not yet decided against authorizing wide-scale plutonium recycling and to deny the license applications. Rather, it has ordered a cessation, for a period expected to last approximately two years, of its decisionmaking process on these issues. We believe it evident that the NRC was not required to prepare an EIS before taking this step, for a number of reasons:

The December 23 Order must be seen in the context of the entire course of events contemplated by the NRC. After it received a number of applications for licensing of plutonium recycling facilities, the NRC realized that it was faced with policy choices that would have a significant impact on the environment, and that it was therefore necessary to prepare an EIS before making any decision whether to authorize the wide-scale reprocessing of spent fuel or to grant the requested licenses. GESMO was to be that EIS, and was to be completed prior to any decision so that it could introduce into the NRC's decisionmaking process input on relevant environmental issues, as mandated by NEPA.[79] What the December 23 Order did was to

---

74. 156 U.S.App.D.C. at 404, 481 F.2d at 1088 (footnotes omitted).

75. *See, e. g., Cady v. Morton*, 527 F.2d 786, 794 (9th Cir. 1975).

76. 42 U.S.C. § 4331(b)(6) (1976).

77. *See Shiffler v. Schlesinger*, 548 F.2d 96, 100–101 (3d Cir. 1977) (preparation of EIS is part of decisionmaking structure through which substantive objectives of NEPA may be realized).

78. *See, e. g.,* Final GESMO–I, vol. 1, Summary at i (NRC, 1976); Draft GESMO, vol. 2 at I–2 (AEC, 1974); 39 Fed.Reg. at 5356 (1974). That an EIS was required before a decision could be reached on plutonium recycling was confirmed in *NRDC v. NRC supra.*

79. *See* text accompany notes 6–7 *supra.*

suspend the decisionmaking process, including the preparation of an EIS, without taking any position on the ultimate issues for which an EIS is required. This action in no way violates NEPA. As the Supreme Court declared in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), "[T]he procedural duty imposed upon agencies by [§ 102(2)(c)] is quite precise, and the role of the courts in enforcing that duty is similarly precise." [80] An EIS is not required, the Supreme Court continued, when an agency is "merely contemplat[ing] . . . [a proposal or] at any other point prior to the formal recommendation or report on a proposal," because "[c]ontemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal actions." [81] Moreover, the Court counseled that it is not the role of the judiciary to "determine a point during the germination process of a potential proposal at which an impact statement *should be prepared*." [82] There is nothing in the record to suggest that the NRC will not undertake to complete an EIS as part of its decisionmaking process on whether or not to authorize the wide-scale recycling of plutonium and whether or not to grant the requested licenses. The specific time when that EIS is to be prepared, however, is for the NRC to determine.[83]

It is also important to note that petitioners' argument in this respect would produce a completely illogical result. As just mentioned, GESMO itself was to be an EIS. The December 23 Order, which terminated the GESMO proceedings, was based in part on the NRC's judgment that it could not make an informed decision—as it is required to do under NEPA [84]—on the environmental impact of reprocessing spent fuel because studies are still in progress on the feasibility of employing alternative fuel sources. Not only would the adoption of petitioners' position necessitate the preparation of an EIS—the statutorily-compelled procedure for ensuring informed decisionmaking on matters affecting the environment—despite this lack of information, it would also require the preparation of an EIS before an agency may delay preparation of an EIS. Such a result could not have been intended by Congress when it enacted NEPA.

## V. CONCLUSION

A pressing problem in this last quarter of the twentieth century is a dwindling supply of energy resources coincident with a rising demand for that supply. Increased reliance has been placed on nuclear fuel as one of the more promising sources of energy, at least for the next few years. Nuclear energy, however, presents problems of its own. As recent events have demonstrated, radiation danger to the general population cannot always be contained. Moreover, there exists the risk that nuclear materials and knowledge will be used for nonpeaceful purposes.

Far-reaching policy choices must inevitably be made regarding energy resources,

---

80. 427 U.S. at 406, 96 S.Ct. at 2728.

81. *Id.* at 406, 96 S.Ct. at 2728.

82. *Id.* (emphasis in original). In a later footnote, the Court elaborated:

[Section 102(2)(C)] contemplates a consideration of environmental factors by agencies during the evolution of a report or recommendation on a proposal. But the time at which a court enters the process is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption.

*Id.* at n.15, 96 S.Ct. at 2728.

83. Because of our disposition of petitioners' contentions, and our holding that as a matter of law no EIS is required at this stage of the administrative process, we need not decide at this time the standard of review this Court might apply when it reviews an agency determination that a proposed action had only an insignificant impact on the environment and that accordingly an EIS is unnecessary. *See* NAACP v. Medical Center, Inc., 584 F.2d 619, 635 n.19 (3d Cir. 1978); *Shiffler v. Schlesinger, supra,* 548 F.2d at 104–05 n.5.

84. *See* 42 U.S.C. § 4332 (1976).

development, conservation and consumption. Indeed, the directions selected may well determine the future character of our society. In a democracy, though, these choices must be made by the political branches of government, not by the courts.

Congress has delegated authority in the delicate area of nuclear energy to a number of agencies, among them the NRC. The NRC is charged with the responsibility of protecting the common defense and security as well as the public health and safety, while overseeing the licensing of nuclear facilities. Some of the decisions it makes to further its statutory mandate may be unpopular in the nuclear industry, among environmentalists, or with other groups of citizens. But Congress has decreed that the agency be independent from outside control, and it would subvert this design were we to invalidate the challenged NRC action when it appears to be consonant with statutory dictates and not an unreasonable exercise of its discretion.

Accordingly, the petitions for review will be denied.